900 F.2d 269
 283 U.S.App.D.C. 285, 110 P.U.R.4th 555
 PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
El Paso Natural Gas Company, Southern California Gas
Company, Mobil Oil Corporation, Northwest Pipeline
Corporation, Chevron U.S.A., Inc., Kern River Gas
Transmission Company, Pacific Gas & Electric Company,
Texaco, Inc., et al., United States Borax and Chemical
Corporation, Transwestern Pipeline Company, Mojave Pipeline
Company, The Process Gas Consumers Group, Wyoming-California
Pipeline Company, Wyoming Natural Gas Pipeline Authority,
Amoco Production Company, El Paso Municipal Customer Group,
Southern Union Gas Company, Southwest Gas Corporation, Intervenors.
MOJAVE PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Northwest Pipeline Corporation, Kern River Gas Transmission
Company, United States Borax and Chemical Corporation,
Southern California Gas Company, Mobil Oil Corporation,
Transwestern Pipeline Company, Chevron U.S.A., Inc., Public
Utilities Commission of the State of California, El Paso
Natural Gas Company, Wyoming-California Pipeline Company,
Pacific Gas & Electric Company, Amoco Production Company,
Southern Union Gas Company, Southwest Gas Corporation, The
Southern California Utility Power Pool, et al., The Process
Gas Consumers Group, Intervenors.
KERN RIVER GAS TRANSMISSION COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Southern California Gas Company, Transwestern Pipeline
Company, Mojave Pipeline Company, Public Utilities
Commission of the State of California, Northwest Pipeline
Corporation, Wyoming-California Pipeline Company, Pacific
Gas & Electric Company, Amoco Production Company, Southern
Union Gas Company, United States Borax and Chemical
Corporation, Chevron U.S.A., Inc., Southwest Gas
Corporation, Southern California Utility Power Pool, et al.,
Texaco, Inc., et al., El Paso Natural Gas Company, Intervenors.
KERN RIVER GAS TRANSMISSION COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Wyoming-California Pipeline Company, Transwestern Pipeline
Company, Public Utilities Commission of the State of
California, Southern Union Gas Company, Northwest Pipeline
Corporation, El Paso Natural Gas Company, Southern
California Gas Company, Southwest Gas Corporation, Pacific
Gas & Electric Company, Southern California Utility Power
Pool, et al., Mojave Pipeline Company, Intervenors.
PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Southwest Gas Corporation, Wyoming-California Pipeline
Company, Northwest Pipeline Corporation, Pacific Gas &
Electric Company, Southern California Gas Company, Kern
River Gas Transmission Company, El Paso Natural Gas Company,
Southern Union Gas Company, Transwestern Pipeline Company,
Chevron U.S.A., Inc., New Mexico Department of Energy,
Mineral & Natural Resources, et al., The Process Gas
Consumers Group, Mojave Pipeline Company, Intervenors.
 Nos. 89-1189, 89-1215, 89-1230, 89-1372 and 89-1396.
United States Court of Appeals,
District of Columbia Circuit.
Argued Jan. 26, 1990.
Decided April 3, 1990.
As Amended May 10, 1990.
 
 Mark Fogelman, with whom Janice E. Kerr and J. Calvin Simpson, San Francisco, Cal., were on the brief, for Public Utilities Com'n of the State of Cal. in Nos. 89-1189 and 89-1396 and intervenors in No. 89-1215, 89-1230 and 89-1372.
 Lynn R. Coleman and Jeffrey D. Komarow, with whom Stephen E. McGregor, Douglas E. Nordlinger, and John S.L. Katz, for Mojave Pipeline Co., Harold L. Talisman, Michael J. Thompson, Terence J. Collins, Ernest B. Abbott, Washington, D.C., and Craig R. Rich, for Kern River Gas Transmission Co., were on the joint brief, for petitioners and intervenors in Nos. 89-1215, 89-1230, 89-1372, 89-1189 and 89-1396.
 Robert H. Solomon, Atty. F.E.R.C., with whom Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., was on the brief, for respondent in all cases. Frank R. Lindh, Atty., F.E.R.C., Washington, D.C., also entered an appearance for respondent.
 
 
 1
 Daniel F. Collins, with whom G. Mark Cook and Bernard A. Foster, III, Washington, D.C., were on the brief, for intervenor Wyoming-California Pipeline Co. in Nos. 89-1189, 89-1215, 89-1230, 89-1372 and 89-1396. G. William Stafford, Washington, D.C., also entered an appearance for intervenor.
 
 
 2
 Kim M. Clark, Washington, D.C., Donald J. MacIver, Jr., Richard Owen Baish, Michael D. Ferguson, El Paso, Tex. and Rush Moody, Jr., Washington, D.C., entered appearances for intervenor El Paso Natural Gas Co. in Nos. 89-1189, 89-1215, 89-1230 and 89-1396.
 
 
 3
 Richard P. Bonnifield, Washington, D.C., entered an appearance for intervenor Northwest Pipeline Corp. in Nos. 89-1189, 89-1215, 89-1230, 89-1372 and 89-1396.
 
 
 4
 Michael D. Gayda and E.R. Island, Los Angeles, Cal., entered appearances for intervenor Southern California Gas Co. in Nos. 89-1189, 89-1215, 89-1230, 89-1372 and 89-1396.
 
 
 5
 William I. Harkaway, Steven J. Kalish and Carl M. Fink, Washington, D.C., entered appearances for Southwest Gas Corp. in Nos. 89-1189, 89-1215, 89-1230, 89-1372 and 89-1396.
 
 
 6
 John B. Price, Houston, Tex., entered an appearance for intervenor Mobil Oil Corp. in Nos. 89-1189 and 89-1215.
 
 
 7
 David R. Stevenson, Carroll L. Gilliam and J. Paul Douglas, Washington, D.C., entered appearances for intervenor Chevron, U.S.A., Inc. in Nos. 89-1189, 89-1215, 89-1230, 89-1372 and 89-1396.
 
 
 8
 Lindsey How-Downing and Steven F. Greenwald, San Francisco, Cal., entered appearances for intervenor Pacific Gas and Electric Co. in Nos. 89-1189, 89-1215, 89-1230, 89-1372 and 89-1396.
 
 
 9
 John P. Beall entered an appearance for intervenor Texaco, Inc., et al., in Nos. 89-1189 and 89-1230.
 
 
 10
 Robert J. Haggerty, Washington, D.C. and Robert B. Rice, Austin, Tex., entered appearances for intervenor Southern Union Gas Co. in Nos. 89-1189, 89-1215, 89-1230, 89-1372 and 89-1396.
 
 
 11
 Steven S. Wall and John W. Leslie, San Diego, Cal., entered appearances for intervenor U.S. Borax and Chemical Corp. in Nos. 89-1189, 89-1215 and 89-1230.
 
 
 12
 Albert S. Tabor, Jr., and Deborah A. MacDonald, Houston, Tex., entered appearances for intervenor Transwestern Pipeline Co. in Nos. 89-1189, 89-1215, 89-1230, 89-1372 and 89-1396.
 
 
 13
 Edward J. Grenier, Jr., William H. Penniman and James M. Bushee, Washington, D.C., entered appearances for intervenor The Process Gas Consumers in Nos. 89-1189, 89-1215 and 89-1396.
 
 
 14
 Roger C. Fransen, Cheyenne, Wyo., entered an appearance for intervenor Wyoming Natural Gas Pipeline Authority in No. 89-1189.
 
 
 15
 J. Peter Luedtke and Adelia S. Maddox, Washington, D.C., entered appearances for intervenor Amoco Production Co. in Nos. 89-1189, 89-1215 and 89-1230.
 
 
 16
 Susan N. Kelly and John P. Gregg, Washington, D.C., entered appearances for intervenor El Paso Mun. Customer Group in Nos. 89-1189 and 89-1372.
 
 
 17
 Norman A. Pedersen, Washington, D.C., entered an appearance for intervenors The Southern California Utility Power Pool, et al., in Nos. 89-1215, 89-1230 and 89-1372.
 
 
 18
 George C. Garikes, Washington, D.C., entered an appearance for intervenor New Mexico Dept. of Energy, Minerals and Natural Resources, et al. in No. 89-1396.
 
 
 19
 Before WALD, RUTH BADER GINSBURG, and WILLIAMS, Circuit judges.
 
 
 20
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 21
 In Order No. 436 the Federal Energy Regulatory Commission adopted procedures for granting Optional Expedited Certificates ("OEC"), 1982-85 FERC Stats. & Regs. [Reg. Preambles] p 30,665 (1985), codified at 18 CFR Secs. 157.100-157.106 (1989), so that firms could extend services and facilities, under conditions that would satisfy Sec. 7 of the Natural Gas Act, 15 U.S.C. Sec. 717f (1988), without going through the slow, costly process of traditional Sec. 7 certification. The increased speed is possible because an OEC applicant must first meet certain threshold requirements designed to assure that it bears an adequate share of the risk of the proposed pipeline; the Commission found that with this assurance it could normally infer that the project would advance the public interest without further proceedings. We upheld these regulations against several generic attacks in Associated Gas Distributors v. FERC, 824 F.2d 981, 1030-38 (D.C.Cir.1987), and six weeks later the Wyoming-California Pipeline Company applied for an OEC to construct a pipeline from Lincoln County, Wyoming to Bakersfield, California. Oil producers in California want to use the gas for Enhanced Oil Recovery, generating steam to inject it into wells to reduce the viscosity of "heavy" oil enough to make it extractable. The producers have been using the wells' crude oil, but for economic and environmental reasons would prefer to use gas. Wyoming-California Pipeline Co. (Declaratory Order on Non-Environmental Issues), 44 FERC p 61,001 at 61,001-03 & n. 3 (1988) ("WyCal Declaratory Order"). At the time of WyCal's filing, petitioners Kern River Gas Transmission Company and Mojave Pipeline Company had applications pending for traditional Sec. 7(c) certificates to serve essentially the same market. WyCal received a conditional OEC in just over one year, on November 30, 1988, contingent on successfully completing an environmental hearing. It satisfied that contingency promptly and the certificate became effective on January 13, 1989. Thus the relative speed of the OEC procedures enabled WyCal to leapfrog its competition.
 
 
 22
 Several petitioners attack the Commission's grant of WyCal's OEC. The Public Utilities Commission of the State of California, the state regulatory body charged with regulating the gas industry in California and with protecting the interests of consumers, which we will simply call California, asserts that FERC improperly preempted its jurisdiction by misreading Sec. 1(b) of the NGA. California also claims that FERC failed to weigh the environmental effects of WyCal's pipeline as required by the National Environmental Policy Act. Petitioners Kern River and Mojave challenge the procedural fairness of the Commission's giving WyCal's OEC application the accelerated processing called for by the OEC regulations while theirs languished in traditional Sec. 7(c) procedures. Also, Kern River and Mojave argue that FERC should have adjudicated their claims that WyCal misappropriated their planned pipeline routes. We affirm the Commission on all issues.
 
 I. Federal Preemption
 
 23
 In the proceedings below California attempted to assert jurisdiction over part of WyCal's proposed pipeline. At a minimum it wanted jurisdiction over the "taps, meters and other tie-in facilities" that link the pipeline to end users.[1] Confronted with this claim, FERC held that its own jurisdiction was exclusive over the entire pipeline. Section 1(b) of the Natural Gas Act controls:The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.
 
 
 24
 NGA Sec. 1(b), 15 U.S.C. Sec. 717(b) (emphasis added).
 
 
 25
 First we must correct California's assumption that FERC's and its jurisdiction are concurrent, an assumption that leads it to invoke California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987), for the idea that it may control the transportation so long as its regulations reasonably accommodate federal concerns. But in Granite Rock the Court had found that no federal statute was intended to preempt all state environmental regulation. Id. at 588, 107 S.Ct. at 1429. Here, if there be Commission jurisdiction over some component of the transaction, it is exclusive over that component.
 
 
 26
 Before enactment of the Natural Gas Act in 1938, a series of Supreme Court decisions had held that state regulation of the interstate transportation of natural gas, or of wholesale interstate sales, was invalid under the negative implications of the Commerce Clause. See Illinois Natural Gas Co. v. Public Service Co., 314 U.S. 498, 504-06, 62 S.Ct. 384, 386-87, 86 L.Ed. 371 (1942) (detailing decisions). The NGA was designed to fill the regulatory "gap" and Congress intended to "occupy this field," H.R.Rep. No. 709, 75th Cong., 1st Sess. 2 (1937), quoted in Illinois Natural Gas, 314 U.S. at 506-07 n. 1, 62 S.Ct. at 387-88 n. 1, a metaphor strongly associated with, and often taken to automatically entail, exclusive federal control. See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300, 305, 108 S.Ct. 1145, 1151, 1153, 99 L.Ed.2d 316 (1988); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); National Fuel Gas Supply Corp. v. Public Serv. Comm'n of New York, 894 F.2d 571, 575-76 (2nd Cir.1990). Cases are legion affirming the exclusive character of FERC jurisdiction where it applies, both under the NGA, see Northern Natural Gas Co. v. State Corporation Comm'n of Kansas, 372 U.S. 84, 91, 83 S.Ct. 646, 650, 9 L.Ed.2d 601 (1963); Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas, --- U.S. ----, 109 S.Ct. 1262, 1274, 103 L.Ed.2d 509 (1989); Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300-01, 305, 108 S.Ct. 1145, 1150-51, 1153, 99 L.Ed.2d 316 (1988); National Fuel Gas Supply Corp. v. Public Serv. Comm'n of New York, 894 F.2d 571, 575-76 (2nd Cir.1990), and under the analogous provisions of the Federal Power Act, see Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 108 S.Ct. 2428, 2439, 101 L.Ed.2d 322 (1988) (exclusive federal jurisdiction over wholesale electric rates under Sec. 201 of the Federal Power Act, 16 U.S.C. Sec. 824); id. at 2442 (Scalia, J., concurring in the judgment) ("if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject"); Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). To the extent state regulation would operate "within this exclusively federal domain," it is preempted.[2] Schneidewind, 485 U.S. at 305, 108 S.Ct. at 1153 (emphasis in original); id. at 306, 108 S.Ct. at 1154.
 
 
 27
 As many transactions will have both a "jurisdictional" component (i.e., one subject to FERC jurisdiction) and a nonjurisdictional one, however, federal and state jurisdiction are interlocking. As to any nonjurisdictional aspect, preexisting state power is essentially undisturbed.[3] The Supreme Court said in Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947), that "in no manner" was the Act to "usurp[ ]" state authority. Id. at 520, 68 S.Ct. at 196. See also FPC v. East Ohio Gas Co., 338 U.S. 464, 470, 70 S.Ct. 266, 269, 94 L.Ed. 268 (1950) ("the state alone could regulate the gas after" it left interstate commerce) (emphasis added); FPC v. Panhandle Eastern Pipe Line, 337 U.S. 498, 513, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499 (1949) ("Neither state nor federal regulatory body was to encroach upon the jurisdiction of the other.").
 
 
 28
 The Supreme Court has already interpreted the Natural Gas Act's line between FERC's jurisdiction over "the transportation of natural gas in interstate commerce" and the states' reserved authority over "local distribution facilities." In FPC v. East Ohio Gas Co., 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950), it held that Commission jurisdiction extended over "the high-pressure trunk lines to the point where pressure was reduced and the gas entered local mains." Id. at 470, 70 S.Ct. at 269.[4] FERC applied East Ohio here and found that WyCal's proposed facilities were "large diameter, high pressure lines," stating the pressure in precise figures. See Mojave Pipeline Co. (Order Denying Motion to Consolidate, etc.), 41 FERC p 61,040 at 61,117 (1987); see also Mojave Pipeline Company (Order Prescribing Joint Environmental Hearing, etc.), 42 FERC p 61,351 at 62,002 (1988). We have no standard of comparison to call these high or low, but California contests neither the numbers nor FERC's conclusion that they amount to "high pressure" within the meaning of East Ohio.[5]
 
 
 29
 California attempts to distinguish East Ohio on the grounds that the large, high pressure trunk lines there did not make any direct deliveries to end users, as WyCal's will. Where such deliveries are made by an interstate transporter, California argues that the transporter's facilities for delivery to the end user constitute local distribution facilities, protected from federal jurisdiction under the reservation clause of Sec. 1(b). Brief for Petitioner California at 8-9. The "local distribution" clause of Sec. 1(b) would on this reading place an independent limit on the grant of "interstate transportation" jurisdiction: delivery to an end user would be non-jurisdictional even though it would otherwise be merely the final stage of interstate transportation under East Ohio.
 
 
 30
 The Supreme Court has in the past approved the Commission's assertion of authority over certification of interstate gas transportation all the way through to an end-user. See FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961). If California's view were correct, the Commission might have been seen to lack authority over, say, the last foot of pipe making the connection. Instead, in Transcontinental the Court thoroughly endorsed Commission authority, even to the point of its approving its consideration of the price of the sale as relevant to the Commission's exercise of discretion, though one might well have supposed that issue reserved to the states as part of their conceded jurisdiction over interstate retail sales. Nevertheless, one cannot rest too much on Transcontinental, for no state was seeking to veto the sale by asserting jurisdiction over the final delivery to the end user.
 
 
 31
 While as a matter of ordinary English "local distribution" might be understood to encompass any delivery to an end user, that is hardly the only or even more plausible reading. Distribution conjures up receiving a large quantity of some good and parcelling it out among many takers. The legislative history of the Natural Gas Act supports this view and undercuts any suggestion that final delivery to an end user transforms the terminal stage of transportation into distribution. After quoting the reservation language of what became Sec. 1(b) (in exactly the same words as the final form), the House Report said:
 
 
 32
 The quoted words are not actually necessary, as the matters specified therein could not be said fairly to be covered by the language affirmatively stating the jurisdiction of the Commission, but similar language was in previous bills, and, rather than invite the contention, however unfounded, that the elimination of the negative language would broaden the scope of the act, the committee has included it in this bill.
 
 
 33
 H.R.Rep. No. 709, 75th Cong., 1st Sess. 3 (1937); quoted with approval in FPC v. Louisiana Power & Light Co., 406 U.S. 621, 637 n. 14, 92 S.Ct. 1827, 1837 n. 14, 32 L.Ed.2d 369 (1972); and quoted in FPC v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 504 n. 5, 69 S.Ct. 1251, 1255 n. 5, 93 L.Ed. 1499 (1949). The Report even writes off the reservation as mere "surplusage":
 
 
 34
 That part of the negative declaration stating that the act shall not apply to "the local distribution of natural gas" is surplusage by reason of the fact that distribution is made only to consumers in connection with sales, and since no jurisdiction is given to the Commission to regulate sales to consumers the Commission would have no authority over distribution, whether or not local in character.
 
 
 35
 House Report at 3 (emphasis added). Insofar as congressional committees spoke to the matter, therefore, they appear to have viewed distribution as confined to its parcelling out function and (probably) even more narrowly, to parcelling out accompanied by retail sales. As Sec. 1(b) gave the Commission jurisdiction only over sales for resale, the states had unquestioned authority over retail sales anyway, making the reservation for distribution surplusage.
 
 
 36
 Now it is true that the unbundling of sales from transportation service since Order No. 436 has had an impact on the consequences of this allocation of power, and perhaps even raises ambiguities as to the meaning of the House Report. (One might read the House's statement that "distribution is made only ... in connection with sales" as simply a description of the industry as it then existed, and its conclusion that the local distribution clause is "surplusage" as dependent on that description.) In an era when transporters almost invariably bought gas at one end of the pipeline and sold it at the other, gas would normally reach an end user only after a pipeline's retail sale to that user, a transaction unquestionably under the state's control, or after conventional distribution and sale by a local distributor, again clearly subject to state control. Thus California points to Panhandle Eastern Pipe Line Co. v. Michigan Public Service Comm'n, 341 U.S. 329, 333, 71 S.Ct. 777, 779, 95 L.Ed. 993 (1951), where the Court upheld Michigan's assertion of a power to veto the retail sale by an interstate pipeline to a large end user (Ford's Dearborn plant), despite exclusive federal jurisdiction over the transportation. Under modern conditions, by contrast, where the end user often owns the gas and uses the pipeline solely for transportation, application of East Ohio removes this fulcrum for state power.
 
 
 37
 We do not believe that this industry transition calls for a modification of East Ohio, or for finding it, despite the Court's language, limited to high pressure transmission without delivery to an end user. Despite the transition, the state of California has authority over the gas once it moves beyond the high-pressure mains into the hands of an end user. It may well also have authority at the moment of delivery to low-pressure facilities for transmission to end users, a point not before us but seemingly implied by East Ohio. This authority is not limited by the Natural Gas Act except in the remote (and vague) sense referred to at n. 2 above--the state may not use it to usurp a question in federal jurisdiction. Of course the California Commission's own statutory mandate may be so limited that this is thin or no consolation, but the mere fact that changing circumstances may crimp the style of a state agency is scarcely a reason for a sharp shift in the interpretation of a federal statute. Accordingly we hold that acts which constitute "transportation" for Sec. 1(b) purposes under East Ohio remain such even though they end in delivery (at high pressure) to end users.
 
 
 38
 II. The Ashbacker Doctrine and Fundamental Fairness in
 
 Processing Competing Applications
 
 39
 Petitioners Kern River and Mojave argue that the Commission's accelerated processing of WyCal's OEC application in this case violated fundamental fairness and the spirit of Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), which, they assert, incorporates a basic demand that the consideration of mutually exclusive[6] applications be "equal, even-handed and non-prejudicial." Joint Brief for Petitioners Kern River and Mojave at 23. More narrowly, they argue that if the Commission makes a drastic change in the fast-track rules in the course of processing an application, as they claim it did here, this principle of evenhandedness requires it to mitigate the effect on parties who chose the traditional route for their applications because of reliance on the Commission's earlier clues as to what the fast track required. The Justice Department's Antitrust Division supported this latter position before the Commission, arguing that the Commission's shift would thwart competition by giving an unfair advantage to WyCal. See Request of the United States Department of Justice for Rehearing. We find Ashbacker only marginally relevant to these facts and, while the pipelines' fairness principle may be sound, we believe that the evolution of the Commission's OEC criteria here created no unfairness.[7]
 
 
 40
 In Ashbacker the Court held that before an agency grants a license, it must grant a full comparative hearing to each applicant that has filed for a mutually exclusive permit or license. Citizens Communications Center v. FCC, 447 F.2d 1201, 1211 (D.C.Cir.1971); Midwestern Gas Transmission Co. v. FPC, 258 F.2d 660, 666 (D.C.Cir.1958) (applying Ashbacker to applications under the NGA). Of course if Ashbacker applied literally to the Commission's dual track procedures, the pipelines' claim would succeed regardless of the special unfairness claimed to flow from the Commission's supposed change of heart. But Ashbacker cannot intelligibly be understood to require that an agency consolidate into a single comparative hearing applications that are proceeding on legitimately established separate tracks. If an application under traditional Sec. 7 procedures for a certificate that was economically inconsistent with an OEC application triggered a comparative hearing under traditional Sec. 7 principles, the OEC procedures would be undone--at least in any case where a competitor chose to undo them. Indeed, such a principle would destroy any agency's decision to streamline adjudicatory procedures for a specially defined class of applicants: if the tortoises are entitled to engulf the hares in their proceedings, they can destroy the fast track's speed and thus its existence as a fast track. The Ashbacker principle takes this into account, requiring only that an agency "use the same set of procedures to process the applications of all similarly situated persons who come before it seeking the same license." Maxcell Telecom Plus, Inc. v. FCC, 815 F.2d 1551, 1555 (D.C.Cir.1987) (emphasis added). Obviously applicants under the OEC and traditional Sec. 7 procedures are not similarly situated; the first have met generic threshold requirements that the second have been unwilling or unable to satisfy. See Wyoming-California Pipeline Co. (Order Granting Rehearing in Part, etc.), 45 FERC p 61,234 at 61,675-76 (1988).
 
 
 41
 Perhaps recognizing all of this, the pipelines focus on the Commission's supposed shift in the OEC rules, specifically those governing the amount of risk the applying pipeline must bear.[8] WyCal's application made clear its insistence that the Commission allow it to negotiate with its proposed firm transportation customers for a substantial reservation fee--one that would allow it to recover fixed costs, regardless of the customers' actual use of the pipeline, to the same extent as it would under a demand charge set under a Modified Fixed Variable ("MFV") rate design. (Under MFV, a pipeline's fixed charges recover all its fixed costs except for return on equity capital and related taxes. WyCal Declaratory Order, 44 FERC at 61,003; Interstate Natural Gas Pipeline Rate Design, 47 FERC p 61,295 at 62,054 (1989).) Though some of the Commission's statements on the permissible reservation fee are murky, we find no great shift.
 
 
 42
 The text of the OEC rules allows a reservation charge "for firm transportation service consistent with the conditions in Sec. 284.8(d)." 18 CFR Sec. 157.103(d)(3). Section 284.8(d) in turn allows a reservation charge to recover fixed costs not "in excess of those costs that would be recovered by using the same ratemaking methodology used for determining the demand charge in the pipeline's sales rates." 18 CFR Sec. 284.8(d). This suggests that if a pipeline is using (or would have used) an MFV rate structure in its sales rates, it could bargain with its firm transportation customers for an equivalent reservation charge.
 
 
 43
 For their claim of a radical shift, then, the pipelines are driven to reliance on statements of the Commission in the preamble to Order No. 436 and to the language of some decisions on specific applications. They characterize the preamble and practice as in fact allowing reservation charges only "to promote customer accountability in nominating levels of service, i.e., to en sure that shippers would not hoard capacity that was substantially underpriced." Joint Reply Brief for Petitioners Kern River and Mojave at 9. Before reviewing the materials we note that the entire dichotomy between that goal and an MFV-based rate design seems to us artificial. Nothing in the record establishes that the risk allocated to customers that is appropriate to achieve "customer accountability" in bidding for or use of pipeline capacity is necessarily different from what would emerge from application of MFV principles. Indeed, as the latter impose on the customer less than the full fixed accounting cost of the capacity reserved, which may well be less than full opportunity cost, an argument could be made that truly accountable customers should bear more risk than is imposed by MFV.[9]
 
 
 44
 The pipelines are correct that in Order No. 436 the Commission had reasoned that "[a] reservation fee for transportation is permitted because it promotes customer accountability, but does not significantly insulate the pipeline from risk or shift accountability away from the pipeline." Order No. 436, 1982-85 FERC Stats. & Regs. [Reg. Preambles] p 30,665 at 31,577 (1985). The Commission offered no figures as examples of what these principles might entail. Moreover, perhaps because no pipeline firm is likely to have any special monopoly advantage before a pipeline is built, the Commission said it did not intend "the final rule to preclude the negotiation by a pipeline and any of its customers of an appropriate reservation charge for new transportation service comparable to that under [Sec. 284]." See id. at 31,576-77. Assuming a preamble could completely undermine the language of a rule, we find these ruminations not enough to do so here.
 
 
 45
 Before WyCal filed its application, the Commission in fact rejected an OEC application on the ground that it called for a reservation charge computed on MFV principles. Great Lakes Gas Transmission Company, 37 FERC p 61,270 (1986). This opinion contained broad language invoking the supposed dichotomy and appearing to find that an MFV-based reservation fee would shift undue risk to the customers. Id. at 61,798. But there in fact the nominal customer was under common control with the pipelines, and the Commission believed that, with the ultimate customers nowhere to be seen, the nominal user could pass the costs directly on to those customers without the "arms-length negotiation" that it viewed as critical. Id. at 61,799. While the gist of this decision may well be inconsistent with the Commission's ultimate reading of the Order No. 436 regulations (allowing a pipeline, as we shall see, to shift risk per MFV principles to the customers of the specific service, but not to others), the circumstances are plainly special and the reader would be likely to view the decision as no more than a hasty response to a new and unanticipated situation.
 
 
 46
 Six months after WyCal filed, FERC rejected another reservation fee because it recovered 100% of fixed costs--more than allowed under an MFV rate design. Moraine Pipeline Company, 42 FERC p 61,144 at 61,543-44 (1988). Though the Commission again quoted the "customer accountability" language from Order No. 436's preamble, it twice referred to section 284.8(d) as providing the substantive standard for judging the reservation charge. Id. Moreover, in a concurrence, Commissioner Stalon thoroughly spelled out the legal argument that an MFV-based reservation fee would be allowed under Secs. 157.103(d)(3) and 284.8(d). He took the regulations and preamble as aimed mainly at assuring that the pipeline did not escape risk by "rolling" the cost in with charges to customers of other services. Id. at 61,555-57. When it approved WyCal's application, the Commission as a whole adopted Commissioner Stalon's reasoning and also cited this court's similar understanding of the matter in Associated Gas Distributors, 824 F.2d at 1037. See WyCal Declaratory Order, 44 FERC at 61,005-07.
 
 
 47
 We can understand, of course, how a firm that viewed any more-than-MFV risk as unacceptable might have been daunted by some of the Commission's language. But we detect no real unfairness. See Wyoming-California Pipeline Co., 46 FERC at 61,925 (finding no "excessive or unwarranted retroactive impact"). Countering the perplexities of Commission dictum would have required no great risk for Kern River and Mojave; they could have filed OEC applications at the same time as WyCal without any prejudice to their traditional filings. See 18 CFR Sec. 157.103(a) (OEC in no way prejudices any other application)[10]; Wyoming-California Pipeline Co., 45 FERC at 61,676 (noting applicants' "continuing opportunity" to file their own OEC). WyCal even suggested this course to them. Answer of Wyoming-California Pipeline Company to Identified Pleadings at 21. Further, when Mojave and later Kern River did file OEC applications, the Commission acted much faster on them than it had on WyCal's, thus reducing WyCal's advantage.[11] Ultimately, WyCal enjoyed a modest advantage for having relied on the Commission's OEC regulations, rather than being frightened off by its dictum. That it should do so seems not only fair, but a legitimate reward for its role in forcing the issue--inducing the Commission to clarify its views.
 
 III. Misappropriation Claims
 
 48
 Petitioners Kern River and Mojave allege that WyCal's proposed pipeline route is predominantly a combination of their proposed routes and thus takes a free ride on their earlier gathering of engineering and environmental data. They argue that the Commission should have deprived WyCal of any advantage from this alleged misappropriation either by ordering WyCal to reimburse them for this work or by staying its OEC application until their traditional certificates were issued. The Commission held these allegations to be outside the scope of its expertise and declined to rule on them, as it had in the past in similar cases.[12] Wyoming-California Pipeline Co., 45 FERC at 61,685. It suggested they pursue their remedies in the courts, which it believed were a more appropriate forum. Id.; Mojave Pipeline Co. (Order on Rehearing), 46 FERC p 61,311 at 61,932 (1989). We find this decision well within the Commission's discretion, if not compelled by law.
 
 
 49
 Petitioners' argument is that in determining the "public convenience and necessity" of a project, the Commission may not disregard the alleged violations of other laws such as copyright. But in NAACP v. FPC, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), the Supreme Court held that general public interest standards such as those in the Natural Gas Act and the Federal Power Act[13] did not give the Commission authority, in performing its regulatory functions, to weigh evidence that a regulatee engaged in unlawful racial discrimination in its employment relations. Id. at 669-71, 96 S.Ct. at 1811-12. The broad public interest standards in the Commission's enabling legislation are limited to "the purposes that Congress had in mind when it enacted this legislation." Id. at 670, 96 S.Ct. at 1812. This rule helps confine an agency's authorization "to those areas in which the agency fairly may be said to have expertise." Bob Jones University v. United States, 461 U.S. 574, 611, 103 S.Ct. 2017, 2038, 76 L.Ed.2d 157 (1983) (Powell, J., concurring).
 
 
 50
 In NAACP v. FPC the Court identified the principal purpose of the Federal Power Act and Natural Gas Act as being "to encourage the orderly development of plentiful supplies of electricity and natural gas at reasonable prices." 425 U.S. at 670, 96 S.Ct. at 1811. It acknowledged the existence of "other subsidiary purposes," id., which it said included "conservation, environmental, and antitrust" issues, id. at 670 n. 6, 96 S.Ct. at 1812 n. 6. Indeed, this court as early as 1956 had said that the Commission must consider claims that a Sec. 7 certificate would cause anticompetitive effects. City of Pittsburgh v. FPC, 237 F.2d 741, 754 (D.C.Cir.1956); compare California v. FPC, 369 U.S. 482, 484-85, 82 S.Ct. 901, 903, 8 L.Ed.2d 54 (1962) (Commission must stay licensing proceedings to allow courts to dispose of antitrust claims).
 
 
 51
 That Congress should have had environmental and conservation factors in mind in establishing the Commission seems entirely plausible, as the enterprises licensed by the Commission necessarily and typically have dramatic natural resource impacts. Antitrust concerns may be less obviously inevitable (and therefore less likely to have been within Congress's intentions), but the natural gas and electricity enterprises under the Commission's wing typically enjoy some degree of natural monopoly. As regulation and antitrust law are complementary responses to monopoly (ways of increasing the chances that consumers will receive goods at the equivalent of competitive prices), a regulatory eye on such concerns will commonly be useful. By contrast, although petitioners characterize WyCal's behavior as "unfair competitive practices," Joint Brief for Petitioners Kern River and Mojave at 29, in an attempt to make the analogy to antitrust stronger, all their claims either sound in copyright or are substantially related to copyright,[14] a field very distinct from Congress's main purposes in the Natural Gas Act and in which the Commission could never be expected to develop expertise. (Copyright is usually grouped with patent and trademark law. See 28 U.S.C. Sec. 1338 (granting federal district courts exclusive jurisdiction over copyright and patent claims as well as concurrent original jurisdiction over "substantial and related" unfair competition claims).)
 
 
 52
 Indeed, we really do not see how the contrary rule could work. Would the agency have to decide whether the regulatee actually violated any federal law? If so, it would have to investigate and adjudicate questions under numerous statutes on which it had no expertise. Or would it merely determine whether the regulatee had done something arguably in conflict with the policy behind another statute? Here the regulatee could be disadvantaged even though it had actually done nothing in violation of law.
 
 
 53
 We think it plain the Commission had no duty to address these issues, assuming arguendo it had authority to do so.IV. Environmental Issues
 
 
 54
 California contends that FERC has not fully complied with the National Environmental Policy Act ("NEPA"), 42 U.S.C. Secs. 4321 et seq. Its attack is in the blunderbuss style, but three points deserve express treatment. The most interesting is the argument that the Commission could not have balanced the adverse environmental effects against the need for the project because under the OEC procedures it makes no particularized inquiry into the economic benefits of the pipeline. Two of our cases speak of a NEPA requirement that "responsible decisionmakers ... fully advert[ ] to the environmental consequences" of a proposed action and "decide[ ] that the public benefits ... outweigh[ ] the[ ] environmental costs." Illinois Commerce Comm'n v. ICC, 848 F.2d 1246, 1259 (D.C.Cir.1988); Jones v. District of Columbia Redevelopment Land Agency, 499 F.2d 502, 512 (D.C.Cir.1974). Though the Commission engaged in an "individualized consideration and balancing of environmental factors," as required by Calvert Cliffs' Coord. Comm. v. United States Atomic Energy Comm'n, 449 F.2d 1109, 1115 (D.C.Cir.1971), its evaluation of the nonenvironmental aspects of the pipeline was not individualized. As to them the Commission stated that "the interests of the public articulated in our adoption of the optional certificate process [i.e., Order No. 436] outweigh, on balance, the relatively insubstantial environmental harm which will result from a properly mitigated WyCal pipeline." Mojave Pipeline Co., 46 FERC at 61,168 (emphasis added).
 
 
 55
 California's insistence on a particularized assessment of non-environmental features finds no support in the statutory language. See NEPA Sec. 102, 42 U.S.C. Sec. 4332 (requiring the agency to consider a variety of environmental, not economic, factors). Its theory would disable any number of efforts at streamlining the resolution of regulatory issues that have nothing to do with the environment. An agency's primary duty under the NEPA is to "take[ ] a 'hard look' at environmental consequences." Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). We will not extend that statute well beyond its realm so as to create unnecessary conflicts with others.
 
 
 56
 We recognize that in the OEC context the Commission's generic affirmative finding may sweep in an occasional project that is, quite apart from environmental factors, only marginally desirable. If the environmental features were a significant net negative, a project not in the overall public interest could slip through. But the mere possibility of such a project, and of the Commission's failing to spot it as a loser, is not enough to justify our burying the Commission in red tape. Errors are always possible; it is not our province to inflict such burdens on the system in pursuit of an illusory perfection. See Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).
 
 
 57
 Second, California charges that FERC committed a procedural foul by issuing WyCal a conditional OEC before the environmental hearing was completed. While it is generally true that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," 40 CFR Sec. 1500.1(b) (emphasis added), we held in Illinois Commerce Comm'n that this did not prevent an agency from making even a final decision so long as it assessed the environmental data before the decision's effective date. 848 F.2d at 1259; see also 40 CFR Sec. 1506.1(a). Here, the Commission's non-environmental approval was expressly not to be effective until the environmental hearing was completed. See WyCal Declaratory Order, 44 FERC at 61,013; Wyoming-California Pipeline Co., 45 FERC at 61,676. Similarly, the Commission's deferral of decision on specific mitigation steps until the start of con struction,, when a more detailed right-of-way would be known, was both eminently reasonable and embraced in the procedures promulgated under NEPA. See 40 CFR Secs. 1505.2(c), 1505.3.
 
 
 58
 Third, California objects that the Commission failed to assess cumulative impacts from successive similar pipelines. As the proceeding was intended to treat all three then pending proposals for pipelines from Wyoming to the Enhanced Oil Recovery market, Mojave Pipeline Company, 42 FERC at 62,003, such impacts were a theoretical possibility. But the ALJ and the Commission found that the EOR market would not support more than one interstate pipeline, see Mojave Pipeline Co. (Initial Decision on Environmental Issues), 45 FERC p 63,005 at 65,022, 65,036 (1988); Mojave Pipeline Co., 46 FERC at 61,162, a prediction California does not dispute.[15] As successive pipelines were not reasonably foreseeable, there was no need to consider the cumulative impacts of more than one pipeline. Moreover, the Commission included conditions in the final OEC that would allow it to mitigate the cumulative effects from construction of two pipelines. Id.
 
 
 59
 * * *
 
 
 60
 In conclusion, we affirm the Commission's grant of an OEC to WyCal. The petitions for review are
 
 
 61
 Denied.
 
 
 
 [1]
 This jurisdiction would give California a toehold to bring WyCal within its regulatory reach, and might help it to mitigate the effects of, or even completely prevent, WyCal's bypass of local distribution companies. California does not here make any claim that FERC was arbitrary and capricious in its disposition of any attacks on the certificate based on such bypass or its effects
 
 
 [2]
 Even where state regulation operates within its own field, it may not intrude "indirectly" on areas of exclusive federal authority. Northern Natural Gas Co., 372 U.S. at 91, 83 S.Ct. at 650. See also Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); Northwest Central Pipeline Corp. v. State Corp. Commission of Kansas, --- U.S. ----, 109 S.Ct. 1262, 1274-75, 103 L.Ed.2d 509 (1989)
 
 
 [3]
 The slight qualification is needed because some preexisting state power might have been curbed by the NGA. The Court's pre-NGA Commerce Clause decisions sometimes took a flexible approach to state jurisdiction, with the analysis turning on the "local interest" in the transaction, see, e.g., Pennsylvania Gas Co. v. Public Service Comm'n, 252 U.S. 23, 29, 40 S.Ct. 279, 280, 64 L.Ed. 434 (1920); see also FPC v. East Ohio Gas Co., 338 U.S. 464, 470 n. 10, 70 S.Ct. 266, 269 n. 10, 94 L.Ed. 268 (1950), whereas in the NGA Congress drew a bright line in defining federal jurisdiction, see FPC v. Southern California Edison Co., 376 U.S. 205, 213-15, 84 S.Ct. 644, 650-51, 11 L.Ed.2d 638 (1964). Thus the pre-1938 limits of state jurisdiction are not necessarily the same as under the NGA, and consequently the old negative Commerce Clause decisions are not reliable statutory guides. Schneidewind, 485 U.S. at 305-06, 108 S.Ct. at 1153-54
 
 
 [4]
 Congress later overruled the narrow holding of East Ohio, creating the so-called "Hinshaw pipeline" exception for a company transporting gas in interstate commerce but operating exclusively in one state and with rates and service regulated by the state. See NGA Sec. 1(c), 15 U.S.C. Sec. 717(c)
 
 
 [5]
 In any event, we would owe deference to an agency's decision on a mixed question of fact and law, even though it be entangled with the agency's jurisdiction. See NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 829-30, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984); see also FPC v. Southern California Edison Co., 376 U.S. 205, 210 n. 6, 84 S.Ct. 644, 648 n. 6, 11 L.Ed.2d 638 (1964). See also Michigan Consol. Gas Co. v. FERC, 883 F.2d 117, 119-20 (D.C.Cir.1989) (finding similar transaction interstate transportation of gas). Though we ordinarily grant considerable deference to an agency's interpretation of its statute under Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we have stated that such deference may be "inappropriate" where the agency is interpreting a statute "delimiting its jurisdiction." New York Shipping Ass'n v. Federal Maritime Com'n, 854 F.2d 1338, 1363 (D.C.Cir.1988) (alternative holding); but see Mississippi Power & Light, 108 S.Ct. at 2444 ("it is plain that giving deference to an administrative interpretation of its statutory jurisdiction or authority is both necessary and appropriate") (Scalia, J., concurring in the judgment). As we view the Commission's interpretation here as the better reading of the statute, we need not rule on the issue of deference owed
 
 
 [6]
 It is economic not legal mutual exclusivity that triggers Ashbacker, see Delta Air Lines v. Civil Aeronautics Board, 228 F.2d 17, 22 (D.C.Cir.1955); Midwestern Gas Transmission Co. v. FPC, 258 F.2d 660, 666 (D.C.Cir.1958) (defining area of mutual exclusivity based on the "economic reach" of the proposed pipeline). Although the Commission made no formal finding of such exclusivity between WyCal's OEC and the Kern River and Mojave applications, it did observe that the record "suggest[s] that no more than one line will be built." Mojave Pipeline Co. (Opinion Affirming Initial Decision on Environmental Issues and Making Supplemental Findings), 46 FERC p 61,029 at 61,162 (1989). Thus we will assume the three applications were mutually exclusive economically. (While our ruling on this point rejects one of the reasons given by the Commission for not applying Ashbacker, see Wyoming-California Pipeline Co. (Order Denying Requests for Rehearing), 46 FERC p 61,310 at 61,926 (1989), the Commission provided other reasons to sustain its decision, as noted in the text.)
 
 
 [7]
 California also objected on Ashbacker grounds, but it made the broader argument that Ashbacker strictly applied and that the Commission was bound to consolidate the OEC and traditional applications for a single comparative hearing. We are uncertain of California's standing to raise an Ashbacker claim, but our analysis of the pipelines' claim makes it clear that California's loses a fortiori
 
 
 [8]
 Petitioners do not challenge the substance of the new interpretation. Indeed they enthusiastically support it. See Joint Brief for Petitioners Kern River and Mojave at 14
 
 
 [9]
 A customer holding a freely marketable entitlement to firm service would bear the full opportunity cost of the capacity (regardless of what it paid), and thus be fully accountable at least as to the use of the capacity, but so far as appears customers do not receive such an entitlement
 
 
 [10]
 Kern River and Mojave argue that, despite the apparently clear meaning of Sec. 157.103(a), the Commission has a general policy against simultaneously processing two applications by the same company to construct the same facilities. Joint Reply Brief for Petitioners Kern River and Mojave at 10 & n. 12. Thus, they argue, they would have been prejudiced because an OEC filing would have held up their traditional filings. In the only case they cite on this point, however, FERC postponed consideration of duplicative traditional applications because the parties had so requested. Mobile Bay Pipeline Projects, 49 FERC p 61,006 at 61,020 (1989). Nothing leads us to believe that the Commission would not have accommodated the wishes of the parties in this case, had they applied. But Kern River and Mojave did not even try
 
 
 [11]
 The Commission granted Mojave an OEC on May 8, 1989, just seven months after its filing (October 3, 1988) and only six months after WyCal was conditionally issued its OEC and only four months after that OEC became effective. Mojave Pipeline Co. (Order Issuing Certificates), 47 FERC p 61,200 (1989). Kern River filed much later, on September 1, 1989, 53 Fed.Reg. 38,897, yet it received its OEC in less than five months. Kern River Gas Transmission Co., Nos. CP89-2047-000 et al. (Jan. 24, 1990). In contrast, WyCal's OEC took over fifteen months from filing (August 8, 1987) to its conditional issuance (November 30, 1988). See Wyoming-California Pipeline Co. (Order Issuing Conditional Certificate), 45 FERC p 61,353 (1988). (Final issuance was delayed until the completion of the environmental review on January 13, 1989. See Mojave Pipeline Co. (Opinion Affirming Initial Decision on Environmental Issues and Making Supplemental Findings), 46 FERC p 61,029 (1989).)
 
 
 [12]
 See Tuolumne Regional Water District, 19 FERC p 61,132 at 61,242 (1982) (referring parties to "other forums" to pursue copyright allegations); Southern California Edison Co., 18 FERC p 61,212 at 61,431 (1982) (same)
 
 
 [13]
 See 15 U.S.C. Secs. 717(a), 717b, 717f(a-c), (e); 16 U.S.C. Secs. 797(e), (g), 800(a), 803(i), 806, 815, 824(a), 824a(a-c), (e), 824b(a-b), 824c(a)
 
 
 [14]
 In the subsequent civil suit, Kern River charged WyCal with copyright infringement and common law misappropriation. See Brief for Respondents at 37; Kern River Gas Transmission Co. v. Coastal Corp., Civ. No. H-89-0904 (S.D.Tex. July 17, 1989). (The district court has denied Kern River injunctive relief, though it left open the possibility of damages after full trial.)
 
 
 [15]
 Though this finding conflicts somewhat with the Commission's position on the Ashbacker issue, we earlier rejected that position and assumed in our Ashbacker analysis that WyCal's project would be mutually exclusive as a practical matter. See supra n. 6