The **KANSAS POWER AND LIGHT COMPANY**, Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION**, Respondent,

**Williams Natural Gas Company, Atlas Powder Company**, Intervenors.

No. 89–1160.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 7, 1989.

Decided Dec. 15, 1989.

Petition for Review of Orders of the Federal Energy Regulatory Commission.

Martin J. Bregman, with whom John K. Rosenberg, William I. Harkaway and Carl M. Fink, Washington, D.C., were on the brief, for petitioner. Harvey L. Reiter, Washington, D.C., also entered an appearance for petitioner.

Timm L. Abendroth, Atty., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, and Joseph S. Davies, Deputy Sol., F.E. R.C., were on the brief, for respondent. Jerome M. Feit and Hanford O'Hara, Attys., F.E.R.C., Washington, D.C., also entered an appearance for respondent.

Gregory Grady and Douglas O. Waikart, Washington, D.C., for Williams Natural Gas Co., et al., Stuart W. Conrad, Kansas City, Mo., and Joseph Stubbs, Washington, D.C., for Atlas Powder Co., were on the joint brief for intervenors. John E. Holtzinger, Jr., Washington, D.C., also entered an appearance for Atlas Powder Co.

Before WILLIAMS and SENTELLE, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Kansas Power & Light, a local distribution company, appeals from a decision of the Federal Energy Regulatory Commission amending the certificate under which the Williams Natural Gas Company, an interstate pipeline, sells gas to Atlas Powder Company. Before the amendment Williams and KPL each supplied portions of Atlas's demand, KPL using gas in turn supplied by Williams. The amended certificate allows Williams to meet all of Atlas's gas needs directly, bypassing KPL. FERC rested the decision largely on the interest in providing customers the benefits of competition. KPL challenges the order as an unexplained "swerve" from a prior Commission policy against allowing bypass. In fact, however, the pro-competitive shift in Commission policy occurred well before its consideration of this case, was not so radical as to clearly qualify as a swerve at all, and required little explanation in light of other Commission moves to afford gas consumers the benefits of competition. Moreover, the facts of this particular bypass are such that the Commission could have rejected the amendment only under a policy of resolute indifference to the advantages of competition; any defects in the Commission's elaboration of its current approach are in context immaterial.

Atlas owns a nitrogen plant and an explosives plant on the same property. In 1961 Williams's predecessor obtained a cer-

tificate to sell gas to the nitrogen plant; KPL's predecessor had for some time supplied the explosives plant. In 1987 Atlas built a short pipe connecting the two plants. It cancelled its contract with KPL and began taking all its gas directly from Williams, but not more than the amount certificated in 1961.

KPL filed a complaint with FERC, alleging that Williams's sales of gas for use at the explosives plant were not covered by its certificate, and were thus in violation of § 7 of the Natural Gas Act of 1938, 15 U.S.C. § 717f (1988). Williams argued that the 1961 certificate covered the sales, but in the alternative filed to amend the certificate. The Commission found that Williams's sales exceeded the original authority, but amended the certificate; it dismissed KPL's complaint as moot. 45 FERC ¶ 61,272 (1988) ("*Order*"), 46 FERC ¶ 61,216 (1989) ("*Order on Rehearing*").

■ In allowing bypass, the Commission relied almost exclusively on its view that "competition best serves the public interest." *Order*, 45 FERC at 61,854. KPL argues that in doing so the Commission departed from a longstanding policy of favoring service to end users by local distribution companies ("LDCs"). Indeed, at one point the Commission did embrace such a policy, see, e.g., *Panhandle Eastern Pipe Line Co.*, 36 FPC 1107, 1109 (1966), modified, 37 FPC 314 (1967), aff'd, 386 F.2d 607 (3rd Cir.1967), albeit only in the form of a rebuttable presumption, *Michigan Consol. Gas Co. v. FERC*, 883 F.2d 117, 122–23 (D.C.Cir.1989). For over three years, however, FERC has consistently shown a preference for allowing competition:

> In a competitive market environment, the parties are at risk for their own decisions, and the need to provide competitive services is the factor that leads to improved service at lower cost for consumers. ADC–Alabama [an interstate pipeline] perceived a market opportunity to provide gas service at a lower rate than Mobile Gas [the current supplier, an LDC]. Mobile Gas, on the other hand, passed up an opportunity to retain Kerr–

McGee as a customer. Under these circumstances, and in the absence of any suggestion of unfair competition, we believe that the public interest is best served by our sustaining the result of that competition.

*American Distribution Company (Alabama Division) ("ADC")*, 37 FERC ¶ 61,281 (1986) at 61,854–55. Before its decision in this case the Commission applied the pro-competition policy in three additional cases, *Panhandle Eastern Pipe Line Co.*, 40 FERC ¶ 61,220 (1987), reh'g denied in relevant part, 42 FERC ¶ 61,076 (1988), aff'd sub nom. *Michigan Consol. Gas Co. v. FERC*, 883 F.2d 117 (D.C.Cir. 1989), *Williston Basin Interstate Pipeline Co.*, 40 FERC ¶ 61,131 (1987), aff'd, 42 FERC ¶ 61,269 (1988), and *CNG Transmission Corp.*, 43 FERC ¶ 61,500 (1988). And it has done so since, in *Northwest Pipeline Corp.*, 46 FERC ¶ 61,078 (1989), and *Northern Natural Gas Co.*, 46 FERC ¶ 61,270, reh'g denied, 48 FERC ¶ 61,232 (1989). KPL has identified no FERC decisions since *ADC* out of line with this viewpoint.

We have considerable doubt whether petitioner can challenge the application of a three-year-old orthodoxy merely because it resulted from a prior "swerve." But even if it may, *ADC* itself appears to reflect merely an increased focus on the benefits of competition, not the sort of total about-face seen by petitioner. The Commission pointed in *ADC* to its own prior statement that it did not adhere to the pro-LDC policy "with uncompromising rigidity," 37 FERC at 61,855 (internal quotations omitted), and to its limitation of the earlier policy in a 1984 decision:

> While the Commission has stated a preference for service through a local distributor in these cases, the circumstances were different. In those cases, Panhandle was improperly attempting to supplant the distributors' sales. This was attempted by means such as proposing duplicate lines to serve a distributor's existing customers, withholding gas supply from a distributor in order to sell the gas directly to the end-users, or by committing all interruptible capacity directly

to industrials, thereby reducing distributors' load management flexibility. These facts are not present here.

*Id.* (quoting *Panhandle Eastern Pipe Line Co.*, 29 FERC ¶ 61,338 at 61,709 (1984) (footnotes omitted)).

Thus the Commission appears not to have swerved, but to have moved from a tilt against bypass to a tilt in its favor. More important, however, the Commission's bypass policy (to the extent that it was new) was merely part of a broader policy change at the Commission. In an array of roughly contemporaneous decisions the Commission explained that the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 *et seq.* (1988), had in part created, and certainly made possible the development of, a competitive market in natural gas from the wellhead to the burner tip. It identified the benefits that it believed competition throughout that market would afford consumers, and adopted industry-transforming rules aimed at securing them. See, e.g., Order No. 380 (Elimination of Variable Costs From Certain Natural Gas Pipeline Minimum Commodity Bill Provisions), Statutes & Regulations [1982–1985] ¶ 30,571 at 30,965 (1984); Order No. 436 (Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol), Statutes & Regulations [1982–1985] ¶ 30,665 (1985) (throughout). In this context, it is indifference to the advantage of competition, not its pursuit, that would call for explanation.

Seizing upon *ADC*'s qualification—that the Commission would reject bypass in a case of unfair competition—, KPL asserts that Williams's competition is indeed unfair because, it says, it will never be able to undersell Williams. It argues that since Williams's pipeline is the only source of gas to the area, and both Williams and KPL must deal with the same producers, KPL cannot compete successfully against Williams if it charges anything for its transportation service. From this it supposedly follows that allowing Williams to compete with KPL is "inherently unfair."

Throughout this controversy KPL has failed to identify the *service* that it might offer and with respect to which it is now competitively hobbled. So far as transporting gas to Atlas is concerned, the plain fact is that KPL has no service to offer. The Williams pipeline goes to Atlas's door, as it has since 1961. Before the change in 1987, KPL transported the gas a trivial distance, in effect from one doorway to another. For this it charged about 43 cents per thousand cubic feet, or a mark-up of about 20 per cent, aggregating over $100,000 a year. Nice work if you can get it. Now Atlas has no need even for the meager transport formerly provided, as it can move the gas on its own land itself. With Atlas's new arrangement, KPL's offer of transportation amounts simply to an assertion of its legal power to veto the direct sale from Williams to Atlas. The Commission's present decision denies KPL the veto power. The unfairness eludes us.

What KPL could offer is its skill as a purchaser of gas at the wellhead. Williams has obtained a blanket certificate authorizing it to provide transportation service generally and requiring that the service be open to all without discrimination. KPL can take advantage of that service. If its skills in securing gas in the field match those of Williams, it can compete. See *Order on Rehearing*, 46 FERC at 61,-659. If not, it cannot blame FERC.

■ Finally, KPL argues that the Commission erred in not holding a hearing on the effects of the bypass on KPL's other customers.[1] But a hearing is only required if material issues of fact are in dispute. *Southern Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C.Cir.1988); *General Motors Corp. v. FERC*, 613 F.2d 939, 944–45 (D.C.Cir.1979). As KPL has revenues in excess of $90,000,000 per year in Missouri alone, there was no need for a hearing on its assertion that loss of the annual $100,-000 net profit on the Atlas sales would have a "significant impact" on KPL's gas rates to other customers. See Joint Appendix at 110 (Complaint of KPL against Williams before the Commission).

1. We consider KPL's remaining arguments unworthy of discussion.

All this said, we think it appropriate to note a potential difficulty with the Commission's current course. Congress in enacting § 7's prohibition of uncertificated interstate gas transportation presumably supposed that Commission control over entry into such markets would serve some purpose. The standard case for such control lies in the fear that unrestrained competition in a case of "natural monopoly" may lead to wasteful duplication of facilities, and that the unnecessary costs will be passed on to consumers. See, e.g., Harry G. Broadman & Joseph P. Kalt, How Natural is Monopoly? The Case of Bypass in Natural Gas Distribution Markets, 6 Yale J. on Reg. 181, 206–07 (1989); Alfred E. Kahn, II The Economics of Regulation 119–23 (2nd ed.1988); Ernest Gellhorn & Richard J. Pierce, Regulated Industries 277–78 (1982). The regulated firm is to a degree free of market disincentives to waste: because of agency restriction of its prices to cost-based levels, usually well below the price of reasonable substitutes (for most uses), it can typically pass extra costs on to consumers, where an unregulated firm would be restrained either by competition or by concern that the resulting cut in consumption would reduce monopoly profits. There are a variety of answers to all this. See, e.g., *id.* at 279–84. But whatever the merits on either side, for the hard cases the Commission must develop some view of its certification authority consistent with the statutory grant. Further, if parties oppose bypass on the ground that it thwarts state efforts to subsidize residential customers with economic rents se-

cured from businesses, the Commission will have to address such claims. Cf. *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1035–36 (D.C.Cir.1987).

The present case, however, poses no such problem. There was no issue of redundant facilities. As the Commission noted, Williams constructed nothing new to provide the service, see *Order*, 45 FERC at 61,854, and the only facilities mentioned by KPL as necessary for its former service were $18,000 worth of "district regulators."[2] (It was even disputed whether these were installed exclusively to serve Atlas.) If we assume the Commission needed to consider the tendency to thwart cross-subsidization, the tendency here was miniscule. KPL, having no service to offer Atlas, simply provided no reason why FERC should have retained it as an unwanted middleman between Williams and Atlas. Thus, without jeopardizing any potential countervailing values, the Commission was able to secure the benefits of competition, giving Atlas access to market-priced gas and KPL a spur to efficiency and competitive pricing. The Commission's decision to amend Williams's certificate is therefore

*Affirmed.*

---

**2.** Atlas's construction, besides being beyond FERC's jurisdiction, does not appear to pose the sort of problem justifying entry control. As it is not (so far as appears) a regulated monopoly, it is subject to a normal firm's disincentives to indulge in waste.