955 F.2d 1412
 129 P.U.R.4th 630
 CASCADE NATURAL GAS CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Washington Natural Gas Company, Northwest Natural Gas
Company, and Northwest Pipeline Corporation, Intervenors.
WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Northwest Pipeline Corporation, Northwest Natural Gas
Company, North Pacific Paper Corporation, and
Weyerhaeuser Company, Intervenors.
 Nos. 90-9581, 90-9582.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 7, 1992.
 
 Ted P. Gerarden (Andrew N. Greene, with him, on the brief), Donelan, Cleary, Wood & Maser, P.C., Washington, D.C., for petitioner Cascade Natural Gas Corp.
 Robert D. Cedarbaum, Asst. Atty. Gen. (Kenneth O. Eikenberry, Atty. Gen., with him, on the briefs), Olympia, Wash., for petitioner Washington Utilities and Transp. Com'n.
 Timm L. Abendroth, Atty. (William S. Scherman, Gen. Counsel, and Joseph S. Davies, Deputy Sol., with him, on the brief), F.E.R.C., Washington, D.C., for respondent F.E.R.C.
 Helmut Wallenfels, Weyerhaeuser Co., Tacoma, Wash., for intervenors North Pacific Paper Corp. and Weyerhaeuser Co.
 Steven W. Snarr, Asst. Gen. Counsel, and Patricia E. Schmid, Atty., Northwest Pipeline Corp., on the brief, for intervenor, Northwest Pipeline Corp.
 Before LOGAN, ANDERSON and EBEL, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Cascade Natural Gas Corporation ("Cascade") and the Washington Utilities and Transportation Commission ("WUTC") petition for review of orders of the Federal Energy Regulatory Commission (the "Commission") authorizing Northwest Pipeline Corporation ("Northwest") to construct a tap and meter facility that would allow it to deliver natural gas directly to two industrial consumers, Weyerhaeuser Company ("Weyerhaeuser") and North Pacific Paper Corporation ("Norpac"). To receive delivery, these consumers have extended their plant facilities by constructing a 9-mile long pipeline that intersects Northwest's interstate pipeline.[1] Together, these facilities bypass Cascade's own distribution system, obviating the need for Cascade's services--a result that concerns both Cascade, which stands to lose revenues, and the WUTC, which, among other things, fears increased utility rates for the remaining local consumers.
 
 
 2
 Without holding an evidentiary hearing, the Commission authorized construction of the tap and meter facility under Section 7(c) of the Natural Gas Act (the "NGA") and denied the petitioners' motions for a rehearing. Northwest Pipeline Corp., 51 F.E.R.C. p 61,289, reh'g denied, 53 F.E.R.C. p 61,012 (1990). The petitioners seek review of the Commission's orders on several grounds. We have jurisdiction to review the orders under Section 19(b) of the NGA, 15 U.S.C. § 717r(b). Finding no error by the Commission, we affirm.
 
 I.
 
 3
 Cascade, like many other local distribution companies ("LDCs"), is a public utility that holds a state-regulated monopoly on the retail distribution and sale of natural gas within its service area--in this case 86 communities in the states of Oregon and Washington. Northwest, too, holds a virtual monopoly in the same region. However, its business is the interstate transportation and wholesaling of natural gas. Traditionally, acting as merchant, it purchased natural gas from producers and then sold and delivered it to various LDCS, like Cascade, who in turn sold and delivered the gas to local residential and industrial consumers.
 
 
 4
 Recently, restructuring in the natural gas industry has threatened to modify substantially the nature of both businesses. Under a pro-competitive "open access" policy promoted by the Commission, parties (including both LDCs and ultimate consumers) may purchase natural gas directly from producers and then arrange to have it transported by the interstate pipelines on a non-discriminatory basis. As a result, transporting third-party natural gas for hire--not buying it from producers and transporting it for resale to the LDCs--has become a substantial role for pipeline operators like Northwest.
 
 
 5
 Since the LDCs normally maintain the only gas lines connecting an industrial consumer with the interstate pipeline, the LDCs, like the pipeline operators, have also been asked to "unbundle" their services in order to transport gas owned by industrial consumers. The LDCs' services are not indispensable, however. A consumer may determine that it can provide these services more efficiently itself by constructing its own lines for local transportation. Because of the costs involved, those companies close to an interstate pipeline have a greater incentive to construct a bypass than companies distantly located.
 
 
 6
 Here, Weyerhaeuser and Norpac determined that by extending their plant facilities and constructing a meter station to receive delivery directly from Northwest, they would pay $.20 per MMBtu to transport the natural gas locally, instead of the $.70 per MMBtu that Cascade was charging to provide the service. Upon the consumers' request, Northwest agreed to construct the tap and meter facility onto its existing trunk line. The consumers agreed to reimburse Northwest for expenses incurred in constructing the tap and meter facility and any associated litigation. Northwest apparently had little incentive to "compete" with Cascade. It claims its revenues remain the same whether it transports the gas to Cascade's existing facility, from which Cascade transports the gas to Weyerhaeuser and Norpac, or to the tap and meter facility adjoining the consumers' facilities.[2] Northwest applied for the Commission's approval to construct the bypass, and the request was granted.
 
 II.
 
 7
 At the threshold, petitioners maintain that the Commission had no jurisdiction to authorize the bypass construction. "We review the Commission's determination that [construction of the facility is] jurisdictional to ascertain whether the decision has an adequate basis in law." Northwest Pipeline Corp. v. FERC, 905 F.2d 1403, 1407-08 (10th Cir.1990) (citing Walker Operating Corp. v. FERC, 874 F.2d 1320, 1328 (10th Cir.1989), cert. denied, 493 U.S. 954, 110 S.Ct. 365, 107 L.Ed.2d 352 (1989)). In making that determination, this court has held that we "are under no obligation to defer to the agency's legal conclusions." Id. at 1408 (citing Walker, 874 F.2d at 1332).[3]
 
 
 8
 Section 1(b) of the NGA delineates the power of the Commission in the following way:
 
 
 9
 (b) The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.
 
 
 10
 15 U.S.C. § 717(b) (emphasis added).
 
 
 11
 The nature of section 1(b) was greatly influenced by a series of Commerce Clause cases predating the NGA, in which the Supreme Court confronted various challenges to state attempts to regulate natural gas sales. In spite of the conflicting analyses used, these cases drew in effect a "bright line" between the permissible and impermissible forms of state regulation, depending primarily on whether the regulated sale was retail or wholesale. The regulation of direct retail sales by either the LDCs or the interstate pipelines was thought to correspond (perhaps exclusively)[4] to the state regulatory power, while the regulation of interstate transportation and wholesales of natural gas, it was thought, could only be exercised by federal power. See Illinois Gas Co. v. Central Ill. Pub. Serv. Co., 314 U.S. 498, 504-06, 62 S.Ct. 384, 386-87, 86 L.Ed. 371 (1942). Cf. Missouri v. Kansas Gas Co., 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027 (1924); Public Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 54 (1927).[5]
 
 
 12
 Since these decisions had left the states powerless to regulate interstate transportation and wholesales, these matters were left unregulated until Congress enacted the NGA. Section 1(b) of the NGA gave the Commission plenary jurisdiction over three areas, and three areas only: (1) the "transportation of natural gas in interstate commerce," (2) the "sale in interstate commerce of natural gas for resale," and (3) "natural-gas companies engaged in such transportation or sale." 15 U.S.C. § 717(b). See Panhandle Pipe Line Co. v. Public Serv. Comm'n of Ind., 332 U.S. 507, 516, 68 S.Ct. 190, 195, 92 L.Ed. 128 (1947) ("Panhandle I ").
 
 
 13
 Since Congress intended to complement, not supplant, existing forms of state regulation, Congress excluded from the Commission's jurisdiction "any other transportation or sale of natural gas" and "the local distribution of natural gas." 15 U.S.C. § 717(b). However, since Congress believed that the clauses affirmatively granting jurisdiction excluded by definition these negative limitations, Congress "could correctly describe the 'local distribution' proviso as surplusage which was 'not actually necessary.' " East Ohio Gas Co., 338 U.S. at 470-71, 70 S.Ct. at 270.
 
 
 14
 With this, Congress believed that it had cleanly and completely divided the regulatory universe between those matters granted to the Commission and the excluded matters over which the states exercised authority prior to the NGA.
 
 
 15
 Here, Cascade and the WUTC have advanced two arguments against the Commission's assertion of jurisdiction. First, they argue that regulation of the bypass construction implicates the same "local interests" and the same form of local regulation that Congress intended to reserve to the states when it enacted § 1(b) of the NGA. Second, they argue that by transporting gas through the bypass, Northwest has stepped directly into the shoes of Cascade, and consequently Northwest's delivery is the "functional equivalent" of local distribution. While acknowledging that these arguments go against the recent decisions of other circuits, see, e.g., Public Util. Comm'n of Cal. v. FERC, 900 F.2d 269, 274-76 (D.C.Cir.1990); Michigan Consol. Gas Co. v. Panhandle Eastern Pipe Line Co., 887 F.2d 1295, 1300 (6th Cir.1989), cert. denied, 494 U.S. 1079, 110 S.Ct. 1806, 108 L.Ed.2d 937 (1990), the petitioners argue that those decisions are wrongly decided. For guidance, petitioners look to two Supreme Court decisions--Panhandle I and Panhandle Eastern Pipeline Co. v. Michigan Pub. Serv. Comm'n, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951) ("Panhandle II "). In both cases, the Court notes that direct retail sales by the pipelines to industrial consumers are matters of local concern properly regulated by state authority.
 
 
 16
 Focusing, as we must, on the actual language of the jurisdictional provision, again we note that the Commission is given jurisdiction over "the transportation of natural gas in interstate commerce." Here, the disputed matter undoubtedly falls within that grant of jurisdiction. See 15 U.S.C. § 717a(7). "Gas crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey." Maryland v. Louisiana, 451 U.S. 725, 755, 101 S.Ct. 2114, 2134, 68 L.Ed.2d 576 (1981). "The Act gives the Commission jurisdiction over interstate transportation of natural gas as a separate and distinct matter, whether the transportation is for hire or for sale and whether the sale is for consumption or resale." United Gas Pipe Line v. FPC, 385 U.S. 83, 89, 87 S.Ct. 265, 269, 17 L.Ed.2d 181 (1966) (citing FPC v. East Ohio Gas Co., 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950); FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961)).[6]
 
 
 17
 However, as we also noted earlier, the Commission's jurisdiction does not extend to "any other transportation or sale" and the "local distribution of natural gas ... [or] facilities used for such distribution." 15 U.S.C. § 717(b).
 
 
 18
 Since these exclusionary phrases serve to limit the clauses initially granting jurisdiction, if an overlap between the two should appear, we cannot end our inquiry simply by recognizing that the matter involves transportation in interstate commerce. "To avoid encroachment on the powers Congress intended to reserve to the States, we must be careful that we do not 'by an extravagant ... mode of interpretation push powers granted over transportation and rates so as to include [an area excluded from the Commission's jurisdiction].' " Northwest Cent. Pipeline v. Kans. Corp. Comm'n, 489 U.S. 493, 512, 109 S.Ct. 1262, 1275, 103 L.Ed.2d 509 (1989) (citation omitted). By the same token, we cannot interpret the exclusions expansively to carve out from the Commission's initial grant of jurisdiction a new realm beyond that which Congress explicitly intended to preserve to the states. "Exceptions to the primary grant of jurisdiction in section 1(b) are to be strictly construed." Interstate Natural Gas Co. v. FPC, 331 U.S. 682, 690-91, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742 (1947), quoted in Northwest Pipeline Corp. v. FERC, 905 F.2d 1403, 1407 (10th Cir.1990).
 
 
 19
 Consequently, in interpreting the language of these exclusions, our fundamental task is to accord to these exclusions precisely the same weight that Congress intended to accord to them, neither more nor less. Normally, this court takes the view that Congress "intends" what it plainly states on the face of an enacted statute. See, e.g., Miller v. Commissioner, 836 F.2d 1274, 1281-83 (10th Cir.1988). Pragmatically, we have also recognized that a term's "plain meaning" might be a function of its usage in a particular context, historical or otherwise. See Kaiser Steel Corp. v. Pearl Brewing Co., 952 F.2d 1230, 1239-40 (10th Cir.1991); Ute Indian Tribe v. Utah, 716 F.2d 1298, 1303 (10th Cir.1983) ("In determining legislative intent it is necessary to consider the legislation in its historical context and not as if it was passed today." (citation omitted)). Indeed, throughout the history of the NGA, the Supreme Court has interpreted the meaning of the exclusionary phrases by reference to those forms of state regulation existing prior to the NGA. See, e.g., Northwest Cent. Pipeline v. Kan. Corp. Comm'n, 489 U.S. 493, 510-12, 109 S.Ct. 1262, 1273-75, 103 L.Ed.2d 509 (1989); FPC v. Louisiana Power & Light Co., 406 U.S. 621, 638-39, 92 S.Ct. 1827, 1837, 32 L.Ed.2d 369 (1972); Panhandle I, 332 U.S. 495, 514-21, 68 S.Ct. 190, 193-98, 92 L.Ed. 128 (1947).
 
 
 20
 Taking our cue from these guides, we find that none of the section 1(b) exclusions was intended to prevent the Commission's exercise over interstate transportation in this case. The phrase "any other transportation" clearly refers to purely intrastate transportation and is therefore immaterial. The phrases "any other ... sale" and "local distribution" are similar in scope. As understood by Congress, both entail local retail sales to consumers, whether these sales were made by the local distributing companies or directly by the interstate pipelines. While this is facially evident as to the phrase "any other sale," it is also true with regard to "local distribution." Congress believed that there was no overlap between the matters affirmatively granted to the Commission's jurisdiction, i.e. interstate transportation and wholesales, and the negative "local distribution" limitation. See H.R.Rep. No. 709, 75th Cong., 1st Sess. 3 (1937); FPC v. East Ohio Gas Co., 338 U.S. 464, 470-71, 70 S.Ct. 266, 270, 94 L.Ed. 268 (1950).[7] Congress described the "local distribution" proviso as "surplusage" because "distribution is made only to consumers in connection with sales " and the Commission has no power over direct sales to consumers. H.R.Rep. No. 709, 75th Cong., 1st Sess. 3 (1937) (emphasis added), quoted in FPC v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 504 n. 6, 69 S.Ct. 1251, 1256 n. 6, 93 L.Ed. 1499 (1949). See also National Steel Corp. v. Long, 689 F.Supp. 729, 734 (W.D.Mich.1988) ("In other words, Congress understood 'local distribution' as necessarily entailing direct retail sales for consumptive use.").
 
 
 21
 This construction of "local distribution" is supported by the recognition that Congress cleanly adopted the bright line between sales for resale and direct retail sales drawn by the earlier Commerce Clause cases. See Arkansas Elec. Coop. v. Ark. Pub. Serv. Comm'n, 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983) ("Our solution was to fashion a bright line dividing permissible from impermissible state regulation. Simply put, the doctrine of these cases was that the retail sale of gas was subject to state regulation, '... whether the local distribution be made by the transporting company or by independent distributing companies,' but that the wholesale sale of gas in interstate commerce was not subject to state regulation...." (citations omitted)); FPC v. Southern Cal. Edison Co., 376 U.S. 205, 214, 84 S.Ct. 644, 650, 11 L.Ed.2d 638 (1964) ("What Congress did was to adopt the test developed in the Attleboro line which denied state power to regulate a sale 'at wholesale to local distributing companies' and allowed state regulation of a sale at 'local retail rates to ultimate consumers.' " (citation omitted)); FPC v. Transcontinental Gas Corp., 365 U.S. 1, 27, 81 S.Ct. 435, 449, 5 L.Ed.2d 377 (1961) ("Certainly, the consuming State can regulate retail rates at which gas can be sold within the State. This power was recognized at the time the Act was passed, and it is clear that Congress excepted federal regulation of direct sales precisely for this reason." (citations omitted)); Panhandle I, 332 U.S. 507, 517, 68 S.Ct. 190, 195, 92 L.Ed. 128 (1947) ("The line of the statute [§ 1(b) of the NGA] was thus clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive uses."). If this reasoning is correct, the phrase "facilities used for such [local] distribution" likewise applies only to facilities used to supply local consumers at retail. See also FPC v. East Ohio Gas Co., 338 U.S. 464, 469-70, 70 S.Ct. 266, 269, 94 L.Ed. 268 (1950) ("what Congress must have meant by 'facilities' for 'local distribution' was equipment for distributing gas among consumers within a particular local community").
 
 
 22
 Here, the Commission approved the construction to enable Northwest to transport gas interstate for hire, pursuant to out-of-state third-party sales. Quite simply, the bypass transactions do not entail the realm of local retail sales that Congress intended to reserve to the states. See Michigan Consol. Gas Co. v. FERC, 883 F.2d 117, 121 (D.C.Cir.1989) ("The present arrangement is the subject of federal regulation pursuant to the NGA because the arrangement involves the transportation of natural gas in interstate commerce, not a local sale.").
 
 
 23
 Neither of the petitioners' two arguments dissuades us from this reasoning. Even though NGA was designed to preserve existing forms of state regulation, not to supplant them, there is no evidence that Congress intended to preserve state regulation over the interstate transportation for hire pursuant to an out-of-state sale. This phenomenon, by the petitioners' own account, is modern. Instead, petitioners rely on cases where states were found competent to regulate direct retail sales by interstate pipelines--a field we acknowledge is excluded from the Commission's jurisdiction.[8] In essence, they argue that if a state regulatory practice is sufficiently similar to regulatory practices found permissible under the pre-1938 Commerce Clause cases, this is the type of regulation that Congress intended to reserve to the states.
 
 
 24
 We are hesitant to adjudicate in this manner. Cf. Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 305-06, 108 S.Ct. 1145, 1153-54, 99 L.Ed.2d 316 (1988) (Court rejects converse argument that because form of state regulation was precluded by pre-1938 Commerce Clause cases, the matter fell within scope of federal jurisdiction and therefore preempted state regulation). Our task is first one of statutory interpretation. When Congress adopted the wholesale/retail distinction drawn by the earlier cases, the task of deciding on a case-by-case basis the scope of federal and state authority under the differing pre-1938 constitutional analyses came to an end.[9] Therefore, we will not attempt to use one of these analyses to expand by analogy the scope of the jurisdictional limitations.
 
 
 25
 Similarly, we must reject the petitioners' second argument that the bypass involves the "functional equivalent" of local distribution. "Local distribution," as Congress viewed the term, involves two components: the retail sale of natural gas and its local delivery, normally through a network of branch lines designed to supply local consumers. Interestingly, local distribution was originally found to be within the states' power to regulate and therefore excluded from the Commission's jurisdiction, in part because it involved both dividing the gas and supplying it at retail. See, e.g., East Ohio Gas Co. v. Tax Comm'n of Ohio, 283 U.S. 465, 471, 51 S.Ct. 499, 501, 75 L.Ed. 1171 (1931) ("The treatment and division of the large compressed volume of gas is like the breaking of an original package, after shipment in interstate commerce, in order that its contents may be treated, prepared for sale and sold at retail."); Missouri v. Kans. Gas Co., 265 U.S. 298, 309, 44 S.Ct. 544, 546, 68 L.Ed. 1027 (1924) ("The commodity, after reaching the point of distribution ... was subdivided and sold at retail."). While delivery by Northwest and delivery by Cascade are similar in that both result in the final local delivery for consumptive use, a local retail sale is conspicuously missing. Further, in interpreting this statute, we need not second-guess what its nature would have been had Congress in 1938, and the Court prior to that time, faced a natural gas industry resembling that which we face today. If changes in the natural gas industry have undermined assumptions upon which the NGA was based, additional and new limitations on the Commission's authority over interstate transportation may be properly made by Congress. Hence, "we decline the [petitioners'] implied invitation to enlarge the exceptions for state jurisdiction in section 1(b) of the Act to include their 'functional equivalents.' " Michigan Consol. Gas v. Panhandle Eastern Pipe Line, 887 F.2d 1295, 1300 (6th Cir.1989).
 
 
 26
 Finally, the petitioners argue that if the state commission cannot have exclusive jurisdiction, it should at least have concurrent jurisdiction. The WUTC argues that this should be the case even if we reject their argument that the bypass involves "local distribution." We disagree. It is settled that if the NGA grants jurisdiction to the Commission over a matter, as it does here, its jurisdiction is exclusive. See, e.g., Northwest Cent. Pipeline v. Kans. Corp. Comm'n, 489 U.S. 493, 510, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509 (1989); Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300-01, 108 S.Ct. 1145, 1151, 99 L.Ed.2d 316 (1988); Northern Gas Co. v. Kans. Corp. Comm'n, 372 U.S. 84, 89, 83 S.Ct. 646, 649, 9 L.Ed.2d 601 (1963); see also Public Util. Comm'n of Cal. v. FERC, 900 F.2d 269, 274 (D.C.Cir.1990) (citing "legion" of cases "affirming the exclusive character of FERC jurisdiction where it applies").
 
 III.
 
 27
 Next the petitioners make various substantive and procedural challenges to the Commission's proceedings below. Substantively, petitioners object to the Commission's determination that construction of the facility satisfied the "public convenience and necessity" requirement of section 7 of the NGA. Procedurally, petitioners argue that the Commission improperly refused to hold a formal trial-like evidentiary hearing.
 
 A. Public Convenience and Necessity
 
 28
 Under section 7(c) of the NGA, a jurisdictional pipeline must obtain a certificate of public convenience and necessity before constructing or extending facilities for the transportation or sale of natural gas. 15 U.S.C. § 717f(c). That is, the Commission must determine that the construction or extension "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). In making that determination, the Commission must consider all factors bearing on the public interest, not simply those immediately relating to the objects of its jurisdiction. Atlantic Ref. Co. v. Public Serv. Comm'n of N.Y., 360 U.S. 378, 391, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312 (1959); FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961).
 
 
 29
 In reviewing the Commission's determination, we will not review the Commission's factual conclusions if they are supported by substantial evidence. 15 U.S.C. § 717r(b). Nor will we enforce our own notions of good policy by evaluating the Commission's determination as if we were the administrators originally called upon to approve the application. E.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Our task is merely to determine whether the Commission's action was "arbitrary, capricious, ... or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). See Colorado Interstate Gas Co. v. FERC, 904 F.2d 1456, 1459 (10th Cir.1990). We must uphold the Commission's determination if it is based on consideration of the relevant facts and articulates a rational connection between the facts found and the choice made. See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42-43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Given this highly deferential standard of review, we cannot find that the Commission committed error in this case.[10]
 
 
 30
 In recent bypass cases the Commission has articulated the policy of accepting applications for bypass construction, absent a showing of unfair competition or undue discrimination. See, e.g., Northern Natural Gas Co., 46 F.E.R.C. p 61,270, reh'g denied, 48 F.E.R.C. p 61,232 (1989). The Commission has also stated that it will not shield the LDCs against competitive pressures. Id. The Commission believes that its policy of competition is in the public interest, justifying certification under section 7(c) of the NGA:
 
 
 31
 The Commission has given careful consideration to the effects of its competitive policies, including the fact the bypasses may occur, and has, thus far, concluded that the benefits which will accrue to the public as a result of competition in the natural gas industry outweigh any adverse impacts on particular parties.
 
 
 32
 Northwest Pipeline Corp., 51 F.E.R.C. at 61, 912.
 
 
 33
 The Commission has more fully explained the theory upon which this conclusion rests.
 
 
 34
 The benefits of our policy include clear and diverse pressures and opportunities assuring the availability of gas services at lowest reasonable costs. The policy allows increased direct access to transportation and supply markets; encourages responsiveness to supply and price signals; imposes upon the LDC, which often has monopoly power, the need to discipline its costs to maintain its customer base and the incentive to unbundle its services; allows pipelines to compete for markets served inefficiently while protecting against undue discrimination against LDCs; promotes market participation by larger numbers of players, thus providing new supply options and leverage to parties seeking to obtain services priced efficiently; indicates the desirability of renegotiation of contracts executed under substantially different market conditions, and thus assures that the benefits of competition will inure to all market participants, even those customers remaining on an LDC system when a bypass does occur.
 
 
 35
 Northern Natural Gas Co., 48 F.E.R.C. p 61,232.
 
 
 36
 Here, petitioners challenged the proposed bypass on several grounds. The Commission considered and, relative to the standards by which we review its determination, adequately responded to each, deciding ultimately that this particular bypass approval was a proper application of its general policy and therefore in the public interest.[11]
 
 
 37
 1. Unfair Competition and Undue Discrimination
 
 
 38
 Petitioners argue that the Commission's determination of public convenience and necessity was arbitrary and capricious in light of its failure to accept their arguments of unfair competition between Cascade and Northwest and of undue discrimination between various classes of consumers. Cascade cannot fairly compete, according to petitioners, (1) because it is required to offer transportation rates set by the state, which will not necessarily reflect the costs of providing local transportation; (2) because it must incur the costs of providing transportation services to any customer that desires it, while Northwest may "cherry-pick" the customers for which it will construct facilities; and (3) because any consumer that uses Cascade to transport gas locally will pay a total price reflecting (and greater than) the transportation rates charged by Northwest, and therefore it will always be cheaper to receive gas directly from Northwest.
 
 
 39
 In response, the Commission noted that at least the WUTC cannot complain of a competitive disadvantage created by present rate structures because this obstacle falls squarely within the WUTC's power to change. The WUTC may design cost-based rates tailored to the individual consumers seeking transportation services, eliminating the first two grounds for the claim of unfair competition. The Commission also found with regard to the second, "cream-skimming" allegation, that here it was the consumers who first approached Northwest and agreed to compensate it for construction of the facility. Further, the Commission responded that even if Northwest offers its services to select customers, this encourages the LDCs and state commissions to respond competitively to the needs of those consumers. 51 F.E.R.C. at 61,913.
 
 
 40
 Importantly, as Weyerhaeuser and Norpac urge in response to the third allegation, it is not a foregone conclusion that Cascade can never compete with direct delivery from Northwest. These consumers argue that a large capital investment must be made to construct and maintain the facilities required to receive direct deliveries. Presumably, since Cascade has already made and recovered its capital investment in similar facilities, it could discourage consumers from leaving its distribution system by offering cost-based, unbundled services. The Commission attributes the success of other LDCs in retaining customers to this type of action. 53 F.E.R.C. at 61,053.[12]
 
 
 41
 Petitioners also argue that the Commission's policy unduly discriminates between high-volume consumers that by happenstance are located near an interstate pipeline and those located where it is not economically feasible to construct a bypass. "In fact, the result of FERC's current bypass policy is to reserve for only select customers, like Weyerhaeuser and Norpac, access to reasonably priced natural gas service." Opening Brief of the Petitioner WUTC at 34-35. While this characterization implies that customers currently required to utilize Cascades services receive gas at unreasonable prices, the Commission responded with the sufficient explanation that its policies were designed to benefit even these consumers in the long run. 53 F.E.R.C. at 61,053. Further, the Commission indicated that Cascade may continue to approach the Commission and seek a remedy if Northwest engages in anti-competitive or discriminatory behavior. 51 F.E.R.C. at 61,913.
 
 
 42
 In light of these considerations, we cannot say that the Commission's approval of the bypass, in spite of these objections, was arbitrary or capricious.
 
 2. Legitimate State and Local Interests
 
 43
 Petitioners further maintain that the Commission arbitrarily failed to take into account the local effects of the bypass.
 
 
 44
 Traditionally, state regulatory agencies like the WUTC have designed the rates a LDC may charge based on the average cost of providing service to all consumers within the service area that may desire them. This system of rate design acts as a tax upon high-volume consumers who pay rates much higher than the LDC's costs of providing them service and serves to subsidize the provision of services to other consumers within a service area. Presumably, when high-volume consumers like Weyerhaeuser and Norpac leave the distribution system, the LDC can no longer depend on the high profit margins from these customers to achieve the same rate of return it previously received, even though the variable costs associated with providing services to these consumers disappear. The state regulatory commission has two choices: it can force the LDC to swallow its loss, or it can attempt to guarantee to the LDC the same rate of profit by raising the rates of the remaining consumers.
 
 
 45
 Petitioners argued before the Commission that approval of this and other bypasses in the region would increase the rates of services to remaining customers. Petitioners offered no evidence or made no specific allegation as to the degree to which this might possibly occur.
 
 
 46
 In its order denying a rehearing, the Commission offered several reasons for not denying Northwest's application on these grounds. First, it reiterated its claim that "after careful consideration" it concluded that the "benefits which will accrue to the public as a result of competition in the natural gas industry outweigh any adverse impacts on particular parties." 53 F.E.R.C. at 61,052. Second, having noted previously that it was speculative whether remaining consumers would be harmed, because that decision would depend on the WUTC, the Commission noted that the petitioners offered no new evidence to support the claim that adverse effects outweighed the overall benefits of the Commission's policies to the nation as a whole. Id. Third, the Commission reserved the right in future bypass cases "to conclude at some later date that the circumstances obtaining in a particular region of the country or the adverse impact on a particular LDC warrant a different approach." Id. Fourth, the commission noted that presently
 
 
 47
 nothing in the record of this case, or in other recent by-pass cases, leads the Commission to conclude that there is a need at this time to protect one party from the pressures of a competitive market. We note that although Northwest has proposed several transactions which by-pass LDCs, these by-passes will occur in Washington and Oregon and involve more than one LDC. Thus, the adverse effects, if any, are not likely to fall on only one LDC or group of consumers.
 
 
 48
 Id. Finally, the Commission noted that local authorities like the WUTC can discourage consumers from bypassing the LDCs by promoting rate designs and other policies that "will make service provided by LDCs efficient, competitive and, therefore, economical." Id. at 61,053. "If rates to industrial end-users are [consequently] lowered, the state commissions have alternatives which would not necessarily result in rate increases to residential customers. Moreover, it may be in certain circumstances that an increase in rates to residential customers will not be unjust or unreasonable." Id. See also Associated Gas Distrib. v. FERC, 824 F.2d 981, 1036-38 (D.C.Cir.1987), cert. denied, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988).
 
 
 49
 While this response perhaps demonstrates insensitivity to the state's current strategy of subsidizing services to residential consumers, again, there is nothing in this response that would allow us to label the Commission's determination as devoid of a rational basis and therefore arbitrary and capricious.
 
 
 50
 3. Sole Reliance on Private Pecuniary Gain of Consumers
 
 
 51
 This answer applies equally to the petitioners' related claim that the Commission's sole reliance on the private pecuniary interests of two consumers, promoted at the expense of all other local consumers, was not adequate to justify approval. It is clear that the Commission does not view the intended class of beneficiaries so narrowly. "The Commission is convinced that in the long run all consumers will benefit from [its] pro-competitive policies." 53 F.E.R.C. at 61,053. Its theory is that these policies, promoted in this instance, will among other things require Cascade and other LDCs to discipline their costs and unbundle their services, promote market participation by larger numbers of players, and stimulate production and competition at the wellhead, all of which will lead in the long run to more reasonably priced services for all consumers. "Whether FERC's model is 'faulty' or not, which we do not decide, we are not at liberty to replace FERC's economic reasoning, supported by its technical expertise, with our own." Michigan Consol. Gas Co. v. FERC, 883 F.2d 117, 123 (D.C.Cir.1989).
 
 4. Duplicative Facilities
 
 52
 Petitioners also argue that the waste of duplicate facilities justified a denial of the application. The apparent concern with duplicate facilities is that regulated industries charging cost-based rates have little economic disincentive to avoid waste and may easily pass on unnecessary costs to the consuming public--costs that could have been avoided by an appropriate regulatory strategy. See Kansas Power & Light Co. v. FERC, 891 F.2d 939, 943 (D.C.Cir.1989). However, the Commission found, upon sufficient evidence, that Norpac and Weyerhaeuser would bear the cost of construction, not utility rate payers. As to the $35,000 of Northwest's costs attributable to construction of the meter station, the Commission found that this would have an "insignificant effect on its ratepayers." 51 F.E.R.C. at 61,913.
 
 B. Hearing
 
 53
 Finally, petitioners challenge the Commission's refusal to hold a full evidentiary hearing. We believe that this challenge is without merit.
 
 
 54
 Upon receiving an application for a certificate of public convenience and necessity, the Commission is required under section 7(c) of the NGA to "set the matter for hearing." 15 U.S.C. § 717f(c)(1)(B). A hearing requirement such as this "permits all interest parties to be heard and therefore facilitates full presentation of the facts necessary" to the Commission's determination. See United Gas Pipe Line Co. v. McCombs, 442 U.S. 529, 538, 99 S.Ct. 2461, 2467, 61 L.Ed.2d 54 (1979). However, it does not follow that a trial-type evidentiary hearing is required in each case. Absent more specific guidance from the statute, common sense dictates that the Commission be given some flexibility in deciding how it will use its resources to achieve the purposes of the hearing. See Southern Union Gas Co. v. FERC, 840 F.2d 964 (D.C.Cir.1988).
 
 
 55
 Before the Commission may be required to hold a formal evidentiary hearing, at least three conditions must be met. First, a party must make allegations of fact material to the Commission's determination. Id. "FERC is not required to hold evidentiary hearings where only questions of law and policy are matters in controversy." Mobil Oil Corp. v. FERC, 886 F.2d 1023, 1033 (8th Cir.1989). Second, mere allegations of facts are insufficient to mandate a hearing; "petitioners must make an adequate proffer of evidence to support them." Cerro Wire & Cable v. FERC, 677 F.2d 124, 129 (D.C.Cir.1982); Pennsylvania Pub. Utility Comm'n v. FERC, 881 F.2d 1123, 1126 (D.C.Cir.1989). Third, the material facts alleged must be in dispute. 677 F.2d at 129; 881 F.2d at 1126. There is simply no justification for "an evidentiary hearing when the opposing presentations reveal that no dispute of fact is involved." Consolidated Oil & Gas, Inc. v. FERC, 806 F.2d 275, 279 (D.C.Cir.1986).
 
 
 56
 Even when these conditions are met, there is no guarantee that a party will be allowed to present evidence orally or to cross-examine witnesses. Depending on the nature of the inquiry and the evidence, the "full presentation of facts" necessary for the Commission's determination may be achieved by the written submission of evidence. Cf. Amador Stage Lines, Inc. v. United States, 685 F.2d 333, 335 (9th Cir.1982); City of Batavia v. FERC, 672 F.2d 64, 91 (D.C.Cir.1982).
 
 
 57
 Here, petitioners claim that their allegations regarding the increased costs of service for remaining customers, the waste involved with duplicative services, and the unfair competition of Northwest created issues worthy of exploration through a full evidentiary hearing.
 
 
 58
 The Commission disagreed, stating that "the parties had an adequate opportunity to present their views and the Commission had an adequate record upon which to base its decision in this proceeding." 53 F.E.R.C. at 61,052.
 
 
 59
 Having reviewed the nature of the allegations and the way in which they were placed before the Commission, we find that the Commission adequately resolved these issues without resort to a full evidentiary hearing.
 
 
 60
 With regard to the claim of the bypass' local impact on remaining customers, the Commission noted, and we agree, that petitioners "presented no hard data to support their predictions." Id. Such evidence could have been presented with the original protests or later when the petitioners sought rehearing. In fact, if petitioners could have shown "reasonable grounds for failure to adduce such evidence in the proceedings before the Commission," then they could have requested from this Court "leave to adduce additional evidence." 15 U.S.C. § 717r(b). In essence, the petitioners argument is that even absent particular allegations of adverse local impact, the Commission's statutory duty alone (to consider all relevant factors) required it to hold hearings to investigate the local impact. However, the precedent cited earlier as to the Commission's obligation to hold an investigative hearing is precisely to the contrary. Given the Commission's prior consideration and analysis of this issue, and its conclusion that its bypass policy will produce long-run benefits to all consumers, it has no affirmative obligation to explore the potential local effects in every bypass case merely upon a party's unsubstantiated and unquantified allegation.
 
 
 61
 As to the claim of duplicative facilities, the parties were able to present evidence and develop an adequate record without resorting to a trial-like hearing. Petitioners did not dispute that Weyerhaeuser and Norpac would bear nearly all costs of constructing the bypass, and there was no need for a hearing to explore the effects of the $35,000 in costs that Northwest could attribute to the bypass arrangement.
 
 
 62
 Similarly, while petitioners explained in general terms the theories upon which they claimed unfair competition and undue discrimination, the Commission and other parties responded in kind. There were no underlying disputes over specific material facts that required a hearing.
 
 
 63
 Given our treatment of the merits of this case, we do not need to consider other forms of remedial relief requested by petitioners.
 
 
 64
 Petitioners have moved to strike the letter of supplemental authorities submitted by intervenor Weyerhaeuser. While this letter was brought pursuant to an extravagant interpretation of Fed.R.App.P. 28(j), one upon which we do not look with particular favor, we nevertheless deny the motion.
 
 
 65
 Accordingly, the orders of the Commission are AFFIRMED.
 
 
 
 [1]
 The orders only purported to approve the tap and meter facility. The construction of the consumers' pipeline, which at various times has been termed "nonjurisdictional," and its preceding approval, are not the subject matter of these proceedings
 
 
 [2]
 As Northwest has hinted, however, it does have an economic interest in constructing the bypass to the extent higher natural gas prices encourage the end users to utilize their alternate energy sources (i.e., coal or fuel oil)
 
 
 [3]
 In reaching that conclusion, these cases do not discuss the potential application of the analysis outlined by the Supreme Court in Chevron USA, Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Compare Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 380, 108 S.Ct. 2428, 2443, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring in the judgment, and asserting that deference applies to an agency interpretation of limits on its statutory jurisdiction) with id., 487 U.S. at 383-91, 108 S.Ct. at 2445-49 (Brennan, J., dissenting, and asserting the contrary). Because we can safely hold that the Commission properly asserted jurisdiction in this case, even without deferring to the Commission's own interpretation, we will not inquire further into that question
 
 
 [4]
 See FPC v. East Ohio Gas Co., 338 U.S. 464, 470-71, 70 S.Ct. 266, 269-70, 94 L.Ed. 268 (1950) ("For in decisions prior to enactment of the statute this Court ... had made it clear that the national commerce power alone covered the high-pressure trunk lines to the point where pressure was reduced and the gas entered local mains, while the state alone could regulate the gas after it entered those mains." (emphasis added))
 
 
 [5]
 The Court reached this result using two types of analyses. In one line of cases, the Court used a "mechanical test" that conceptually divided intrastate from interstate commerce at the point where the natural gas was reduced in pressure for distribution to local retail customers. See Public Util. Comm'n for Kans. v. Landon, 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577 (1919)
 In another set of cases, the Court used a "local interest" analysis, and instead of trying to confine state power to some point at which interstate turned into intrastate commerce, the Court simply found some forms of state regulation of interstate commerce to be acceptable within the confines of the dormant Commerce Clause. See Pennsylvania Gas Co. v. Public Serv. Comm'n of N.Y., 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 (1920). The Supreme Court has suggested that by 1938, the mechanical test represented the Court's proper mode of analysis. See East Ohio Gas Co., 338 U.S. 464, 470 n. 10, 70 S.Ct. 266, 269-70 n. 10.
 
 
 [6]
 See also FPC v. Louisiana Power & Light Co., 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972) (Commission has power to regulate curtailment of interstate sales directly to industrial consumers under the head of its "transportation" jurisdiction in § 1(b)); Michigan Consol. Gas Co. v. FERC, 883 F.2d 117, 121 (D.C.Cir.1989) ("It is hardly conceivable that a transaction could fit more neatly into the category of 'transportation of natural gas in interstate commerce.' ")
 In fact, both Panhandle cases unequivocally recognize that the direct sales by interstate pipelines to industrial consumers are made in interstate commerce. See Panhandle I, 332 U.S. at 513, 68 S.Ct. at 193 ("The sales here were clearly in interstate commerce."); Panhandle II, 341 U.S. at 333, 71 S.Ct. at 779 ("The sale to industrial consumers as proposed by appellant is clearly interstate commerce."). Interstate commerce does not cease when natural gas reaches the tap and meter facility. "Those merely mechanical considerations are no longer effective, if ever they were exclusively, to determine for regulatory purposes the interstate or intrastate character of the continuous movement and resulting sales we have here." 332 U.S. at 512, 68 S.Ct. at 193 (footnote omitted). See also Illinois Natural Gas Co. v. Cent. Ill. Pub. Serv. Co., 314 U.S. 498, 503, 62 S.Ct. 384, 386, 86 L.Ed. 371 (1942) ("That appellant[s] ... are engaged in interstate commerce in the purchase and sale of the natural gas which moves in a continuous stream from points without the state into appellant's pipes within the state seems not to be open to question." (emphasis added)).
 
 
 [7]
 The Supreme Court has noted on several occasions that there is no necessary conflict between the Commission's jurisdiction over interstate transportation and the states' jurisdiction over direct sales. See FPC v. Louisiana Power & Light Co., 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972) (Commission has power to regulate curtailment of interstate sales directly to industrial consumers under the head of its "transportation" jurisdiction in § 1(b)); FPC v. Transcontinental Gas Pipe Line Corp, 365 U.S. 1, 4, 81 S.Ct. 435, 437, 5 L.Ed.2d 377 (1961) (direct sale from pipeline to industrial consumer is "not subject to the Commission's jurisdiction except insofar as § 7 requires the Commission to certificate the transportation of gas pursuant to the sale."); see also Panhandle I, 332 U.S. at 507 n. 23, 68 S.Ct. at 198 n. 23 (maintaining a distinction between the state's authority over direct sales and the Commission's jurisdiction under the label of interstate transportation to authorize the building of facilities to an industrial consumer under § 7(c) of the NGA)
 
 
 [8]
 The Panhandle cases are inapposite. Both cases involved Commerce Clause challenges to the state's attempt to regulate direct sales by the pipelines to industrial consumers. Both cases note that direct sales fall into the "other sales" exclusion of the NGA and therefore were the permissible object of state regulation. The talk of "essentially local concern" was not directly relevant to the task of interpreting the NGA exclusions. Rather, it served as an alternate ground upon which to uphold the state's exercise of power under the Commerce Clause, and further it did so as part of a post-1938 analysis, not one of the differing analyses upon which the NGA was based. In Panhandle I, the Court explicitly refused to rest on this alternate ground, having already found that the NGA allowed state regulation of direct sales. 332 U.S. at 524, 68 S.Ct. at 199. In Panhandle II, the Court explicitly ruled that even in the absence of the NGA, a state could regulate direct sales without violating the Commerce Clause. See 341 U.S. at 333-34, 71 S.Ct. at 780
 
 
 [9]
 By adopting the "bright line" distinction between wholesale and retail sales made by the earlier cases, Congress in fact attempted to avoid " 'drawing the precise line between state and federal power by the litigation of particular cases.' " Arkansas Elec. Coop. v. Ark. Public Serv. Comm'n, 461 U.S. 375, 380, 103 S.Ct. 1905, 1910, 76 L.Ed.2d 1 (1983) (citation omitted). That is, the Supreme Court would no longer have to define the limits of state power by reference to the mechanical test or a local interests test. Id. at 379-80, 103 S.Ct. at 1910
 There appears to be some confusion between the "bright line" distinction between wholesale and retail sales and the "mechanical test" dividing interstate from intrastate commerce. Because of the suggestion that the mechanical test, instead of a local interest analysis, represented the proper mode of analysis at the time of the NGA's passage, on occasion the mechanical test has been used as a proxy for the retail/wholesale distinction in informing the scope of the NGA jurisdiction provision. See FPC v. East Ohio Gas Co., 338 U.S. 464, 469-71, 70 S.Ct. 266, 269-70, 94 L.Ed. 268 (1950) (holding that high-pressured trunk lines of LDC was in interstate commerce). While it is true that the different treatment between wholesale and retail sales in part came about through application of the mechanical test, it cannot be said that the NGA was based entirely on the mechanical test. Clearly, under the NGA, direct sales by a pipeline to a consumer are placed under the states' power, even though under the mechanical test the matter may have been found within interstate commerce, and similarly gas delivered at reduced pressure to a utility will be in interstate commerce, even though under the mechanical test it might have been found in intrastate commerce. Panhandle I, 332 U.S. 507, 513, 68 S.Ct. 190, 193, 92 L.Ed. 128 (1947) ("Variations in main pressure are not the criterion of the states' regulatory powers under the commerce clause."). In any case, as the cases we cite demonstrate, the usual emphasis by the Supreme Court has been on the wholesale/retail distinction. Cf. FPC v. East Ohio Gas Co., 338 U.S. 464, 482, 70 S.Ct. 266, 276, 94 L.Ed. 268 (Jackson, J., dissenting) ("However, this pressure factor is one which we found immaterial in [citation omitted], where, with rare unanimity, we put our emphasis upon the fact of sale for resale in interstate commerce. But today it is the difference between retail and wholesale operations which is termed immaterial, so long as the factor of high-pressure pipe lines is present.").
 Recently, in litigation identical to this, a panel of the District of Columbia Circuit based its holding that bypass (involving a high pressure pipeline) was not a facility for local distribution on the basis of the East Ohio mechanical analysis. See Public Util. Comm'n of Cal. v. FERC, 900 F.2d 269, 275-77 (D.C.Cir.1990). Ironically, in spite of this reliance, the court also suggested that "the pre-1938 limits of state jurisdiction are not necessarily the same as under the NGA, and consequently the old negative Commerce Clause decisions are not reliable statutory guides." Id. at 275. Here, the Commission has sought some support from the East Ohio analysis, and Cascade concedes that delivery to the consumers would occur through high-pressured trunk lines. Request for Rehearing and Stay of Cascade Natural Gas Corp. at 7-8, R. Tab 20. Because we find the wholesale/retail distinction adequate to resolve this case, we do not need to consider the application of the East Ohio mechanical analysis here.
 Finally, we note that even if the pre-1938 cases provide the touchstone of the Commission's authority, and assuming some type of a local interests analysis as opposed to the mechanical test should be used, the post-1938 analysis found in the Panhandle cases would still be immaterial.
 
 
 [10]
 In reviewing the Commission's orders we are also cognizant of other statutory limitations on our jurisdiction. "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 15 U.S.C. § 717r(b). Our review of the petitioners' requests for rehearing does not reveal petitioners' argument that the Commission has unlawfully shifted the burden of proof in 7(c) proceedings. Cf. Brief of Petitioner Cascade at 13; Opening Brief of Petitioner WUTC at 44. Nor does it reveal any discussion as to the potential threat to public safety from Weyerhaeuser's and Norpac's joint operation of the 9-mile pipeline. Cf. Id. at 29
 
 
 [11]
 Petitioners also urge that the Commission's policy of accepting application absent a showing of unfair competition or undue discrimination violates the Commission's affirmative duty under section 7(c) to evaluate all factors bearing on the public interest. While the Commission believes that in most instances satisfaction of these criteria will result in a properly certificable facility, the Commission had "provided for intervention in individual cases where anyone thought otherwise." Associated Gas Distrib. v. FERC, 824 F.2d 981, 1037 (D.C.Cir.1987). "[T]he issues not directly addressed in the initial criteria--notably, impact on competitors--are precisely the ones that are likely to trigger intervention. Under these circumstances, the procedures seem likely to assure an adequate vetting of all relevant and persuasive contentions." Id
 
 
 [12]
 Even if other consumers find they can construct new facilities for receiving direct delivery more cheaply than Cascade can provide local transportation, making Cascade an unneeded middleman, it is difficult to attribute this to unfair competition on the part of Northwest. Moral labels such as "fair" and "unfair" have an uncertain application in this context. It is not clear on what basis Cascade claims an entitlement to the continued captive patronage of consumers that have no further use of its services. As the D.C. Circuit stated: "The unfairness eludes us." Kansas Power and Light Co. v. FERC, 891 F.2d 939, 942 (D.C.Cir.1989)